**CLAY COUNTY MANOR, INC.,**
Plaintiff–Appellee,

v.

**STATE of Tennessee, DEPARTMENT OF HEALTH & ENVIRONMENT,**
Defendant–Appellant.

Supreme Court of Tennessee,
at Nashville.

Feb. 22, 1993.

C.J. Gideon, Jr., Gail Vaughn Ashworth and Bryan Essary, Gideon & Wiseman, Nashville, for plaintiff-appellee.

Charles W. Burson, Atty. Gen. & Reporter and Jerry Taylor, Asst. Atty. Gen., Nashville, for defendant-appellant.

Gordon Bonnyman, Legal Services of Middle Tennessee, Nashville, for amicus curiae Jane Doe and the Tennessee Coalition for Nursing Home Reform.

## OPINION

DROWOTA, Justice.

This is an appeal from an agency action pursuant to the Uniform Administrative Procedures Act, T.C.A. § 4–5–101 *et seq.*, involving the authority of the Commissioner of Health ("Commissioner"), the chief executive officer of the Department of Health, Defendant–Appellant, to suspend admissions to Clay County Manor, a nursing home, Plaintiff–Appellee. The primary question before the Court is whether there is substantial and material evidence in the record supporting the Commissioner's decision of July 28, 1989, to suspend admissions. We answer in the affirmative and, accordingly, reverse the Court of Appeals and reinstate the judgment of the trial court.

### I. *Background*

Clay County Manor, Inc., is a Tennessee corporation operating a nursing home, Clay County Manor, in Celina, Tennessee. The 66–bed facility is licensed as an intermediate care facility [1] by the Board for Licensing Health Care Facilities of the Depart-

---

1. An intermediate care facility is one providing health care and related services to those who, because of their mental or physical condition, require care beyond the level of basic room and board which can only be made available to them in an institutional setting. 9A Tenn. Comp.R. & Regs. ch. 1200–13–1–.01(2); 42 U.S.C. § 1396r(a)(1)(C). (such facilities are now called "nursing facilities").

ment of Health. Clay County Manor has contracted with the Department of Health whereby it participates in the Medicaid program. *See* T.C.A. § 71–5–118(a). Consequently, it receives substantial state and federal funds for the care of eligible patients and is subject to federal and state inspections to monitor compliance with Medicaid standards of care.

In January, 1989, the Department of Health conducted an annual licensing inspection of Clay County Manor as required by T.C.A. § 68–11–210(a)(1). Uncovering a number of deficiencies in the nursing home, the Department assessed civil, Class B monetary penalties against the facility under T.C.A. § 68–11–801 *et seq.* Deficiencies warranting Class B monetary penalties are those that "directly impact the care of the patients in the nursing home and are of such clarity and specificity as to provide ample notice to all nursing homes and to the public of the acts prohibited and the conduct required." T.C.A. § 68–11–803(a). Clay County Manor appealed the penalty assessment to the Panel on Health Care Facility Penalties. *See* T.C.A. §§ 68–11–818, 819.

In June, 1989, while the civil penalty assessment matter was still pending, the United States Department of Health and Human Services conducted its own inspection of Clay County Manor pursuant to federal law governing nursing homes participating in the Medicaid program. This inspection revealed noncompliance with federal health and safety standards, including those related to patient activities, nursing services, patient care management, dietetic services, staff development, and adequacy of staffing. On July 10, 1989, Clay County Manor was notified by the Health Care Financing Administration, a federal agency, that its Medicaid certification would be terminated in 90 days unless it corrected the deficiencies uncovered by the federal inspection. Clay County Manor

submitted a plan to the federal agency to correct the deficiencies. The federal government accepted the plan but, by doing so, did not imply that the deficiencies were actually corrected. Clay County Manor was also subject to further inspections to assure that the deficiencies were, in fact, corrected. 42 C.F.R. §§ 431.610(g)(3), 488.-20(b)(1) (1988).

After the federal inspection, and while the state civil penalty appeal was still pending, the Department of Health received new information concerning inadequate patient care and substandard conditions at the nursing home. Acting on this new information, Dr. Peggy A. Alsup, the Medical Director of the Department's Bureau of Manpower and Facilities and Chairperson of the Board for Licensing Health Care Facilities, decided it was necessary to again inspect Clay County Manor to ascertain the current quality of care residents were receiving. Thus, on July 26, 1989, Dr. Alsup personally lead a team of state inspectors to Clay County Manor to conduct an unannounced inspection pursuant to the provisions of T.C.A. § 68–11–210(b)(3).[2] A few hours into the inspection, a corporate officer of Clay County Manor refused to allow Dr. Alsup to meet, in the absence of the corporate officer, with the daughter of an elderly patient and the patient in the privacy of the patient's room. Dr. Alsup opined that such refusal was a significant obstacle to a meaningful and effective inspection and, accordingly, she and the inspection team left the facility.

In an attempt to continue the inspection, Dr. Alsup and the team returned to Clay County Manor the following day, July 27, 1989. A few minutes after their arrival, Dr. Alsup was notified by the nursing home's attorney that they could not inspect the facility unless they were there to investigate a *specific* complaint and unless the details of the complaint were disclosed *in*

---

**2.** T.C.A. § 68–11–210 provides that, in addition to annual inspections, "the department shall conduct such on-sight inspections and investigations as may be necessary to safeguard and ensure, at all times, the public's health, safety and welfare." T.C.A. § 68–11–210(a)(3)(D). Moreover, "the department shall conduct such

inspections and investigations as may be necessary to appropriately respond to complaints received from the public and to immediately act upon any determination by the board that the public's health, safety or welfare is, or appears to be, threatened." T.C.A. § 68–11–210(a)(3)(E).

*advance* to the nursing home. Not surprisingly, Dr. Alsup was unwilling to disclose in advance what they were looking for and thereby compromise the effectiveness of the inspection. She and the survey team again left the facility and returned to Nashville.

On the next day, July 28, 1989, the Commissioner, pursuant to T.C.A. § 68–11–207(b),[3] issued a lengthy order suspending admissions to Clay County Manor. The order cited several specific deficiencies concerning patient care at the facility brought to the attention of the Commissioner since the federal inspection a few weeks earlier. The interference with the state's inspection on July 26 and 27, 1989, was also cited as a justification for suspending admissions. The Commissioner concluded that conditions at Clay County Manor were "detrimental to the health, safety or welfare of the patients." *See* T.C.A. § 68–11–207(b). Proceedings were also initiated before the Board for Licensing Health Care Facilities to revoke or suspend its license. *See* T.C.A. § 68–11–207(a).

The Board for Licensing Health Care Facilities subsequently conducted a contested case hearing. The Board considered testimony of state and federal inspectors, patients, family members, and other witnesses called by both parties. In agreeing with the Commissioner's decision to suspend admissions, the Board made extensive findings of fact and conclusions of law. The Board found a number of serious deficiencies in patient care, problems with the administration of the facility, and found that the facility had refused to permit Dr. Alsup's team from inspecting, or at least conducting a meaningful inspection, of the facility. The Board recited specific instances "pertaining to lack of personal hygiene, lack of frequent bathing, lack of proper care of incontinent patients, lack of provision for hair care, failure to isolate patients with contagious infections, failure to provide clean clothing, [and] failure to provide procedures for dealing with patients during failure of heat or air-conditioning...." The Board concluded that

[t]he conditions set forth ... reflect conditions which give clear evidence of problems within the facility relating to patient care. A facility when becoming licensed, should understand that it is subject to numerous unannounced inspections by state personnel. Refusal of access on any ground or requiring the state to negotiate or restrict a survey in any manner is repugnant to the legislative, statutory and public demand for enforcement of nursing home regulations. Clay County Manor, Inc., refuses to recognize the state's authority to conduct unfettered inspections of its facility to protect the patients. This position causes concerns of the most serious nature as to the ability of the nursing home to continue serving patients.

Clay County Manor then sought review of the Board's decision in the Chancery Court for Davidson County pursuant to T.C.A. § 68–11–208 and § 4–5–322. The Chancellor affirmed the Board's findings, concluding that substantial and material evidence supported the decision of the Board. The Court of Appeals, over a dissent authored by Judge Koch, reversed, concluding that the Commissioner exceeded the authority granted by T.C.A. § 68–11–207(b) in ordering the suspension of admissions. The Court of Appeals held that "the only existing condition shown by this record is the unwillingness of [Clay County Manor] to submit to an unlimited inspection on the dates in question." The Department then sought review in this Court.

The essence of the Department's contention is that the Court of Appeals erred in holding that the suspension of admissions was based solely on the nursing home's interference with the state's inspections on July 26 and 27, 1989, and that there is substantial and material evidence in the record to support the Commissioner's decision. Clay County Manor asserts that the

---

**3.** "In those cases where the conditions of any nursing home or home for the aged are, or are likely to be, detrimental to the health, safety or welfare of the patient or resident, the commissioner has the authority to suspend the admission of any new patient or resident to the facility pending a prompt hearing before the board, or an administrative judge if the board cannot be convened promptly." T.C.A. § 68–11–207(b)(1).

actions of the Commissioner (and Board) "were commenced without any determination or finding that the existing conditions at the nursing home were, or were likely to be, detrimental to the health, safety or welfare of the residents of the nursing home." The position of Clay County Manor is that the only reason admissions were suspended was because of the interference with the inspections on July 26 and 27, 1989, and that T.C.A. § 68–11–207 prohibits suspension of admissions under the facts presented.

At the outset, we note that our review of the factual issues in this case is to be conducted under a standard of substantial and material evidence based on a consideration of the entire record. T.C.A. § 4–5–322(h)(5). Substantial and material evidence is "such relevant evidence as a reasonable mind might accept to support a rational conclusion and such as to furnish a reasonably sound basis for the action under consideration." *Southern Ry. Co. v. State Bd. of Equalization*, 682 S.W.2d 196, 199 (Tenn.1984).

## II.

**A. Authority of Commissioner to Inspect**

█ Clay County Manor asserts that the inspection team exceeded its authority on July 26 and 27, 1989, in inspecting the nursing home under the facts presented. We disagree. Both state and federal statutes and regulations give the Department broad power to inspect nursing homes. In order for states to receive Medicaid funds, the Department must have a procedure in place to review the appropriateness and quality of care and services furnished to patients and residents. 42 U.S.C. § 1396a(a)(33)(A). Federal law also requires the Department to make on-sight inspections as often as necessary if there is a compliance problem. 42 C.F.R. §§ 431.-610(g)(3)(i), 456.602(a) (1988). There is no question that the state inspection team in the instant case had the authority under federal law to determine at what intervals the inspections would be carried out "based on the quality of care and services being provided in [the] facility and the condition of recipients in the facility." 42 C.F.R. § 456.606 (1988). Federal law makes it clear that the states may "[r]esurvey providers or suppliers as frequently as necessary to ascertain compliance and confirm the correction of deficiencies." 42 C.F.R. § 488.20(b)(1) (1988).

State law likewise vests the Department with broad powers to inspect nursing homes. T.C.A. § 68–11–210(a)(1) requires the Department to inspect every nursing home "at least once each year by the duly appointed representative of the department." Although the Department is required to "make or cause to be made only such inspections necessary to carry out the various obligations imposed ... by applicable state and federal law," state law also mandates that "the department shall conduct such on-sight inspections and investigations as may be necessary to safeguard and ensure, at all times, the public's health, safety and welfare." T.C.A. § 68–11–210(b)(3)(D). The Department is further required to conduct inspections and investigations necessary to appropriately respond to complaints received from the public. T.C.A. § 68–11–210(b)(3)(E).

█ It is clear under both state and federal law that the Department has the authority to conduct as many inspections as it deems necessary to safeguard the public's interest in ensuring proper care and treatment of elderly persons in nursing homes and to ascertain the facility's compliance with state and federal law. Accordingly, we hold that the Department had the authority for conducting the inspections on July 26 and 27, 1989. This conclusion is buttressed by the fact that the state inspection conducted in January, 1989, along with the federal inspection in June, 1989, uncovered significant deficiencies at Clay County Manor related to patient care. Also relevant are the new complaints received by the Department after the federal inspection in June which came to the attention of Dr. Alsup and prompted her to personally lead the inspection team to Clay County Manor in July. The Department has a strong interest in safeguarding the health, safety, and welfare of the nursing home residents. It has statutory authority to conduct, as often as it deems necessary, inspections of

a facility such as Clay County Manor with its history of deficiencies. Having the ability to conduct unannounced inspections is obviously necessary to assure adequate patient care and treatment. Giving a facility the right to "screen" inspections before they occur by requiring an inspection only in response to a specific complaint, and by requiring the inspectors to disclose the details of the complaint prior to the inspection, would seriously interfere with meaningful enforcement of state and federal standards of care.

■■■ Accordingly, our reading of the relevant state and federal law convinces us that the state's authority to inspect is not limited to those instances where there has been a specific complaint, nor is the state required to reveal in advance what the inspectors are looking for. Giving to Medicaid contractors the right to unilaterally specify which areas or subjects will and will not be open to inspection by state health officials would reduce effective monitoring and enforcement to a fiction. Vulnerable patients would suffer the consequences and, at the same time, Medicaid contractors who receive substantial state and federal funds, would not be held accountable in any meaningful way for their expenditure of public funds.[4]

**B. Propriety of Suspending Admissions**

■■ The Court of Appeals held that the Commissioner erred in suspending admissions to Clay County Manor. The Court reasoned that

[t]he only existing condition shown by this record is the unwillingness of [Clay County Manor] to submit to an unlimited inspection on the dates in question. There is no showing of any particular probability of detriment to any patient from said unwillingness to submit, however contrary to the duty of the facility and the rights of the inspectors. Absent such showing of specific danger to pa-

tients resulting from the refusal, suspension of admissions was not available as a device to compel submission to inspection.

We disagree with the intermediate court's conclusion that suspending admissions was an improper sanction.

T.C.A. § 68–11–207(b)(1) provides that "[i]n those cases where the conditions of any nursing home or home for the aged are, or are likely to be, detrimental to the health, safety or welfare of the patient or resident, the commissioner has the authority to suspend the admission of any new patients...." The Commissioner (and Board) based the decision to suspend admissions on several deficiencies in patient care, *plus* the facility's interference with the inspections on July 26 and 27, 1989. Witnesses testified to the residents' poor personal hygiene, residents with clogged catheters, residents with strong body odor, inadequate infection control, substandard treatment of sores, residents left nude in extremely hot rooms, residents whose bodies were smeared with dried fecal material, and inadequate medical assistance. Both the original suspension ordered by the Commissioner, and the order of the Board upholding the suspension of admissions, found that the conditions were, or were likely to be, detrimental to the patients or residents. We have no hesitancy in concluding that the record contains substantial and material evidence sufficient to support the state's determination that deficient conditions at Clay County Manor warranted the suspension of new admissions. The deficiencies were in addition to the interference with the attempts by Dr. Alsup and her team of inspectors to conduct meaningful and effective inspections.

We hold that a suspension of admissions to a nursing home pursuant to T.C.A. § 68–11–207(b) is justified where detrimental conditions and inadequate patient care have

---

4. We further find as unpersuasive Clay County Manor's argument that the Department's "warrantless" inspections violated the search and seizure provisions of the Fourth Amendment. By contracting to receive Medicaid funds, Clay County Manor voluntarily consented to reasonable, warrantless inspections. *United States v.*

*Brown*, 763 F.2d 984, 987–88 (8th Cir.1985) (consent to warrantless search by participating in Medicaid program); *United States v. Griffin*, 555 F.2d 1323, 1324–25 (5th Cir.1977) (same). The record contains no evidence whatever that the inspections in question were conducted in an unreasonable manner.

been discovered through prior inspections and through complaints received, and the facility refuses to allow the state to conduct an inspection under the circumstances presented here.

In view of the foregoing reasons, the judgment of the Court of Appeals is reversed and that of the trial court reinstated. Costs are adjudged against Clay County Manor.

REID, C.J., and O'BRIEN, DAUGHTREY and ANDERSON, JJ., concur.