IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
December 4, 2003 Session

## LISA D. HUCKABEE v. MICHAEL E. MAGILL, COMMISSIONER OF THE TENNESSEE DEPARTMENT OF LABOR AND WORKFORCE DEVELOPMENT, ET AL.

Appeal from the Chancery Court for Hamilton County
No. 02-0713     W. Frank Brown, III, Chancellor

### FILED JANUARY 28, 2004

### No. E2003-01419-COA-R3-CV

This appeal involves a claim for unemployment compensation benefits by Lisa Huckabee ("Claimant"). When Claimant was hired by Watkins & Son, Inc. (the "Employer"), the Employer's policy prohibiting fraternization between employees was explained to her. Nevertheless, Claimant began a consensual affair with a coworker. The coworker's employment was terminated when the Employer learned of the affair. It is disputed as to whether Claimant was discharged or quit before she could be discharged. The Board of Review concluded that Claimant was disqualified from receiving benefits regardless of whether she quit or was discharged. The Trial Court reversed after concluding, *inter alia,* that the issue of whether Claimant was discharged for work related misconduct was not an issue the Board of Review could properly consider because the Employer did not raise that issue at the previous two administrative levels. The Trial Court also concluded that the decision by the Board of Review was not supported by substantial and material evidence. We reverse the judgment of the Trial Court and reinstate the judgment of the Board of Review.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Reversed; Case Remanded.

D. MICHAEL SWINEY, J., delivered the opinion of the court, in which CHARLES D. SUSANO, JR., J., joined, and HOUSTON M. GODDARD, P.J.,not participating.

Stephen S. Duggins, Chattanooga, Tennessee, for the Appellant Watkins & Son, Inc.

Paul G. Summers, Attorney General and Reporter, and Warren A. Jasper, Assistant Attorney General, Nashville, Tennessee, for the Appellee Michael E. Magill, Commissioner, Department of Labor and Workforce Development.

Brian C. Frye, Chattanooga, Tennessee, for the Appellee Lisa D. Huckabee.

# OPINION

## Background

Claimant worked for the Employer in a clerical position from July of 2000 until her employment ended on November 3, 2001. The issues on appeal center around whether Claimant is entitlement to unemployment compensation benefits. The Employer indicated on the Separation Notice sent to the Department of Labor and Workforce Development ("Department") that Claimant voluntarily quit her employment. Later in the proceedings, however, the Employer took an alternative position, arguing that if Claimant did not quit, then she was discharged for work related misconduct. Claimant has maintained from the outset that she was fired because she became "involved" with a coworker.

An initial decision was issued by an agency representative at which time Claimant's request for unemployment compensation benefits was approved. The agency representative found that Claimant "was separated due to fraternization. Evidence submitted is not sufficient to establish she quit or was discharged under disqualifying reasons …."

The Employer appealed the agency decision to the Appeals Tribunal and a hearing was conducted in March of 2002. The first witness was Karen Watkins ("Mrs. Watkins"), the Employer's Vice President. According to Mrs. Watkins, she learned a few days before Claimant was hired that an employee named Rocky Simpson ("Simpson") had had an affair with a coworker. Because of this, Mrs. Watkins explained to Claimant when she was hired the Employer's unwritten policy prohibiting romantic fraternization between employees and the reasons for having such a policy.

Mrs. Watkins testified that Claimant approached her in April of 2001, and stated that there was a rumor going around that Claimant was having an affair with a coworker named Shane. Claimant was upset about the rumor. A meeting was held with the office employees and the Employer's policy prohibiting fraternization between employees and its sexual harassment policy were explained. Claimant was not present at the meeting because she was very upset about the rumor and the Employer's President, Edward Watkins ("Mr. Watkins"), thought Claimant might be too embarrassed to attend.[1]

Mrs. Watkins testified that she was told in early September of 2001, that Claimant was having an affair with Simpson. When Mrs. Watkins spoke to Claimant about what she had heard, Claimant denied having a relationship with Simpson. Mrs. Watkins assumed Simpson likewise would deny having an affair, so the matter was not pursued any further at that time. However, the next month Mrs. Watkins learned that Claimant was pregnant and Simpson was the child's father. Because of this, Simpson's employment was terminated the following day, which was a Saturday. Simpson began cleaning out his truck after he was fired at which time Mrs. Watkins

---

[1] Although not pertinent to the issues on appeal, we are assuming that Mr. Watkins and Mrs. Watkins are husband and wife.

informed him that she would be speaking with Claimant on Monday. Mrs. Watkins testified that she was unsure what to do regarding Claimant's employment because Claimant was pregnant and, therefore, she wanted to speak with an attorney prior to taking any action. In any event, after speaking with Simpson on that Saturday, Mrs. Watkins traveled to Georgia to visit her mother. While en route, she received a phone call from Ronda Swafford ("Swafford"), the Employer's Safety Supervisor. Swafford informed Mrs. Watkins that Simpson had called wanting to speak with her. After Simpson was given Mrs. Watkins' cell phone number, he called her and informed her that he had spoken with Claimant and the two of them were "going to come in to clean out her desk," which they did. The following Monday, Claimant did not report to work. Claimant and Simpson did, however, inform Swafford that they wanted to come in and pick up their Separation Notices. Mrs. Watkins then called the Employer's attorney seeking guidance on how to characterize Claimant's separation from employment. According to Mrs. Watkins, since she had not actually met with Claimant to discuss the situation and because Claimant simply came in and cleaned out her desk, Mrs. Watkins was told to indicate on the Separation Notice that Claimant had quit. Claimant and Simpson picked up their Separation Notices the following day. Claimant was upset because the Separation Notice indicated she had quit, and she told Mrs. Watkins that it should be changed to indicate that she had been fired. Mrs. Watkins stated that Claimant was not discharged because she effectively quit when she came in and cleaned out her desk. Mrs. Watkins then added that "I didn't discharge her but I would have after I talked to my attorney."

Mr. Watkins also testified at the hearing and his testimony was, for the most part, consistent with his wife's testimony. According to Mr. Watkins, after he learned Claimant was pregnant and Simpson was the father, he wanted to terminate both of them. However, that did not happen immediately because Mrs. Watkins believed they should speak with an attorney prior to terminating Claimant. Mr. Watkins testified that Simpson was terminated on a Saturday, and later that day Simpson and Claimant returned to the premises and cleaned out Claimant's desk.

Swafford was the final witness to testify on the Employer's behalf. According to Swafford, she observed Simpson slamming doors in the office sometime in October of 2001. When Swafford asked Simpson what was wrong, Simpson told her that he had been seeing Claimant and she had broken up with him. Soon thereafter, Claimant and Simpson had a discussion and Simpson appeared to calm down. Claimant then informed Swafford that she and Simpson were no longer going to see each other. According to Swafford, at this point she discussed with Claimant the Employer's policy prohibiting fraternization among employees. According to Swafford, she explained to Claimant "in no uncertain terms, that at this point in time, that this would go no further, but it was to be stopped because fraternization is not permitted." Swafford also testified to a telephone call she received from Simpson's wife, who apparently called to tell Swafford that Claimant and Simpson were no longer seeing each other and Swafford did not have to worry about that situation any longer.

The next event discussed by Swafford occurred on November 1, 2001, when Claimant told Swafford she was pregnant, Simpson was the father, and she (i.e. Claimant) did not know what to do. Swafford told Claimant she needed to explain the situation to Mrs. Watkins. According to Swafford:

[Claimant] then told me that she had already previously lied to Ms. Watkins so she could not go to Ms. Watkins and tell her the truth. I then told her that … I would have to go to [the Watkins'] …. I didn't have a choice. … [Claimant asked] me if I would please just make it possible for Mr. Simpson to stay and she would kindly leave and go her own way, knowing that she had lied and she had broken company policy. And that's exactly what … [she] said to me.

Swafford was present when Claimant and Simpson returned to the premises to clean out Claimant's desk. Swafford stated that when they arrived, Claimant told her that she was going to be fine, that she was moving in with Simpson, and "that she was going to go upstairs and clean out her desk." After the desk was cleaned out, Claimant and Simpson told Swafford "good-bye" and left the premises. Claimant did not report to work the following Monday. On Tuesday, Claimant returned to pick up her separation notice and was upset because the notice stated that she had quit.

The next witness was Claimant. When testifying to her version of events and how her employment ended, Claimant stated:

On November the 3rd, which was a Saturday, I was told by Rocky Simpson that he was fired by … [Mr. and Mrs.] Watkins and that Karen [Watkins] had come up to his truck and told him to tell me to come in the office that day and clean my desk out. He came home, where I was at, and told me that Karen wanted me to come in and clean my desk out.…

Claimant further testified that when she returned to clean out her desk, Mr. Watkins would not tell her why she was fired and only told her to clean out her desk. At the hearing, Claimant admitted to having an affair with Simpson. However, she stated that they were "broken up" the first time Mrs. Watkins inquired if they were having an affair, which is why Claimant denied having any relationship. Claimant admitted she was aware of the Employer's policy prohibiting fraternization between employees and that she was informed of this policy when she was hired. She also admitted Mrs. Watkins had explained the policy to her on two different occasions. Claimant denied ever telling anyone that she was quitting.

Simpson testified on Claimant's behalf. Simpson stated that when he was cleaning out his truck after he had been fired, Mrs. Watkins told him to tell Claimant to "come in and clean her desk out or to call me." To Simpson's knowledge, no one ever actually stated that Claimant was fired.

The Appeals Tribunal was the next step in this process, and it also found in Claimant's favor. The Appeals Tribunal concluded that the Employer never actually told Claimant she was being discharged. Instead, she was simply told to clean out her desk. The Appeals Tribunal determined that Claimant had been constructively discharged and the Employer failed to establish intentional work related misconduct by Claimant. According to the Appeals Tribunal, Claimant

"was discharged without reason or cause after the employer told her to go upstairs and clean out her desk." The Appeals Tribunal discussed at some length what "misconduct" by an employee is, and specifically found that the facts did not show that Claimant was guilty of misconduct and, therefore, she was "discharged without reason or cause . . . ."

The Employer appealed the decision of the Appeals Tribunal to the Board of Review ("Board"), and the Board reversed the decision of the Appeals Tribunal. In so doing, the Board noted that the fraternization policy had been discussed with Claimant. According to the Board, after Simpson was terminated Mrs. Watkins told Simpson that Claimant would need to "come in and clean out her desk or call me." Mr. Watkins subsequently received word that the claimant had contacted Swafford and told her that she would be coming in to clean out her desk. The Board also pointed out that Claimant told Swafford that she had lied to Mrs. Watkins about having an affair with Simpson. After reviewing the facts, the Board concluded that the evidence was sufficient to show that Claimant was discharged for misconduct within the meaning of Tenn. Code Ann. § 50-7-303(a)(2). The Board then stated:

> A preponderance of the evidence shows circumstances that would reasonably lead the claimant to believe that she had been terminated from this employment. The comments from the employer's vice-president to the co-worker and from the employer's president to the claimant express a sufficient intent to effect a discharge. The claimant was admittedly aware of the employer's policy prohibiting fraternization among employees and was aware, or certainly should have been aware, that her continued employment was in jeopardy as a result of her admitted "affair" with the co-worker. Such conduct was a deliberate and direct violation of a known policy and substantially disregarded the employer interests. A preponderance of the evidence establishes misconduct by the claimant in this case.

> The Board also finds arguable merit to the employer's contention that the claimant actually voluntarily quit this employment. The facts are sufficiently in dispute and, although the greater weight of the evidence suggests a discharge situation, the Board finds that a denial of benefits would also be found had the matter been decided as a voluntary quit situation as the circumstances do not show good work-related cause for such a separation.

After the Board of Review's opinion was issued, Claimant timely filed a Petition for Certiorari in the Hamilton County Chancery Court ("Trial Court") seeking reversal of the Board's decision. The Trial Court granted the petition and reversed the Board's decision. In summary, the Trial Court stated:

> (a) The issue decided by the Board was whether Claimant was discharged for misconduct under Tenn. Code Ann. § 50-7-

303(a)(2), but this particular issue never should have been considered by the Board because the issue as originally submitted by the parties was whether Claimant voluntarily quit;

     (b)    It was improper for the Board of Review to decide the case based on any grounds other than whether Claimant voluntarily quit her employment;

     (c)    Because the Employer listed "voluntary quit" on the Separation Notice and argued only this position at the first two administrative levels, due process and notions of fair play prohibited the Employer from arguing to the Board of Review that Claimant had been discharged for work related misconduct;

     (d)    While the Employer had the right to fire Claimant, it did not actually do so as evidenced by the Watkins' testimony that they wanted to seek advice from an attorney prior to discharging Claimant;

     (e)    The Board of Review's "alternative" holding to the effect that even if Claimant was not discharged for cause, she was still ineligible for benefits because she voluntarily terminated her employment was beyond the scope of the issue presented to the Board for resolution;

     (f)    There was no substantial evidence to support the conclusion that Claimant voluntarily quit her employment; and

     (g)    Claimant's misconduct was not sufficient to disqualify her from receiving unemployment benefits.

After the Trial Court reversed the Board's decision, the Employer filed a motion to alter or amend the judgment which was denied by the Trial Court, resulting in this appeal. The Employer appeals raising the following issues, which we quote:[2]

     1.    Whether the Chancery Court erred as a matter of law by concluding that it was improper for the Department of Labor and Workforce Development to consider whether the employee/claimant voluntarily quit her job and whether she was discharged for work-related misconduct.

---

[2] The Department of Labor and Workforce Development is also a party to this appeal and argues the Trial Court erred when it reversed the decision of the Board of Review.

2.     Whether the Chancery Court erred as a matter of law by holding that [Claimant's] affair with another employee in direct and knowing violation of company policy was insufficient misconduct to disqualify [Claimant] from receiving unemployment benefits.

3.     Whether the Chancery Court erred as a matter of law by ignoring major components of evidence indicating that [Claimant] voluntarily quit her employment and by accordingly concluding that there was no substantial evidence indicating that [Claimant] voluntarily quit her employment.

## Discussion

Trial courts and appellate courts utilize the same standard of review when reviewing decisions of an administrative agency involving claims for unemployment compensation. *See Armstrong v. Neel*, 725 S.W.2d 953, 955 n.1 (Tenn. Ct. App. 1986). The standard as framed in terms of the trial court's review and as applicable to this appeal is as follows:

(2)     The chancellor may affirm the decision of the board or the chancellor may reverse, remand or modify the decision if the rights of the petitioner have been prejudiced because the administrative findings, inferences, conclusions or decisions are:

(A)     In violation of constitutional or statutory provisions;

(B)  In excess of the statutory authority of the agency;

(C)  Made upon unlawful procedure;

(D)  Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or

(E)     Unsupported by evidence which is both substantial and material in the light of the entire record.

(3)     In determining the substantiality of evidence, the chancellor shall take into account whatever in the record fairly detracts from its weight, but the chancellor shall not substitute the chancellor's judgment for that of the board of review as to the weight of the evidence on questions of fact. No decision of the board shall be

reversed, remanded or modified by the chancellor unless for errors
which affect the merits of the final decision of the board.…

Tenn. Code Ann. § 50-7-304(i)(2)-(3).

In *Jones v. Bureau of TennCare,* 94 S.W.3d 495 (Tenn. Ct. App. 2002), this Court
discussed the concept of substantial and material evidence as follows:

> The term "substantial and material evidence" has been defined
> as "'such relevant evidence as a reasonable mind might accept to
> support a rational conclusion and such as to furnish a reasonably
> sound basis for the action under consideration.'" *Papachristou v.
> Univ. of Tennessee*, 29 S.W.3d 487, 490 (Tenn. Ct. App. 2000)
> (quoting *Clay Co. Manor, Inc. v. State*, 849 S.W.2d 755, 759 (Tenn.
> 1993)). This Court has also described it as requiring "'something less
> than a preponderance of the evidence . . . but more than a scintilla or
> glimmer.'" *Gluck v. Civil Serv. Comm'n*, 15 S.W.3d 486, 490 (Tenn.
> Ct. App. 1999) (quoting *Wayne Co. v. State Solid Waste Disposal
> Control Bd.*, 756 S.W.2d 274, 280 (Tenn. Ct. App. 1988)). Judicial
> review of an administrative agency's decision under the "substantial
> and material evidence" standard, however, subjects the agency's
> decision to close scrutiny. *Sanifill of Tennessee, Inc. v. State Solid
> Waste Disposal Control Bd.*, 907 S.W.2d 807, 810 (Tenn. 1995).

*Jones*, 94 S.W.3d at 501. If the record contains substantial and material evidence to support the
factual findings of the Board, then we are "limited to a review of the questions of law presented."
*Frogge v. Davenport,* 906 S.W.2d 920, 922 (Tenn. Ct. App. 1995) (quoting *Perryman v. Bible*, 653
S.W.2d 424 (Tenn. Ct. App. 1983)). In addition, we must construe the disqualification provisions
of Tenn. Code Ann. § 50-7-303 liberally in favor of the employee. *Simmons v. Culpepper*, 937
S.W.2d 938, 944 (Tenn. Ct. App. 1996).

In the present case, the Trial Court reasoned that the Employer could proceed only
on the theory that Claimant voluntarily quit because: (1) the Employer stated Claimant voluntarily
quit in the Separation Notice the Employer filed with the Department; and (2) that was the only
argument advanced by the Employer at the first two administrative levels. When denying the
Employer's motion to alter or amend the judgment, the Trial Court stated:

> The court found no specific authority for the proposition that
> the employer could not change the basis for termination as the case
> went through the appeal process. However, such would seem to
> violate due process and notions of fair play.

Initially, we must state that we are at a loss as to how due process and notions of fair
play would be violated if the Employer is allowed to make the alternative argument that if Claimant

-8-

did not quit, then she was discharged for work related misconduct. Claimant has argued from the very inception of this case that she was discharged rather than quit. We also note that the initial decision by the agency representative stated that "[e]vidence submitted is not sufficient to establish she quit **or was discharged under disqualifying reasons** . . . ." (emphasis added). At the next step of the process, the Appeals Tribunal also determined both that the Employer had failed to establish intentional work related misconduct and that Claimant "was discharged without reason **or cause** after the Employer told her go upstairs and clean out her desk." (emphasis added). Contrary to the Trial Court's holding, the first two administrative levels did both consider and arrive at a determination as to whether the evidence was sufficient to establish that Claimant's discharge was for misconduct or under disqualifying reasons/for cause. The Board of Review disagreed with their conclusions. Therefore, we hold that it was error by the Trial Court to reverse the Board of Review on due process grounds.

The facts in this case certainly are contradictory is some respects, as is often the case when someone loses his or her job. There are, however, several key undisputed facts in this case, which are: (1) the Employer's fraternization policy and the reasons behind it were explained to Claimant when she was hired; (2) the fraternization policy was explained to Claimant on at least two occasions; (3) she understood the policy; (4) she knowingly violated the policy; (5) when Claimant and Simpson "broke up," he was noticeably upset at work; (6) when asked by Mrs. Watkins whether she was involved with Simpson, Claimant responded no because they had "broken up"; and (7) Claimant once again knowingly violated the policy when she and Simpson resumed their relationship.

For initial discussion purposes only, we first will assume that the Employer was correct in its belief that Claimant voluntarily quit her employment. An employee is disqualified from receiving benefits if she voluntarily quits her job "without good cause connected with such claimant's work." Tenn. Code Ann. § 50-7-303(a)(1). In the present case, if there is substantial and material evidence to support the Board's alternative factual finding that Claimant voluntarily quit her job and the reasons therefor, then the issue of whether she had good cause to voluntarily quit her employment is a question of law. *See, e.g., Frogge v. Davenport,* 906 S.W.2d 920, 922 (Tenn. Ct. App. 1995). Assuming the Employer's version of events is correct in that Claimant voluntarily quit her job before she could be discharged, then we agree with the conclusion of the Board insofar as it stated that "a denial of benefits would also be found had the matter been decided as a voluntary quit situation as the circumstances do not show good work-related cause for such a separation." In short, there was absolutely no evidence presented that Claimant had good work-related cause to quit her job. Therefore, *if* she did quit, she would be disqualified from receiving benefits. We conclude that there is substantial and material evidence in the record to support the Board's conclusion that if Claimant did quit, then she is disqualified from receiving unemployment compensation benefits.

Now we will assume Claimant is correct when she states that she did not quit but was discharged because of her relationship with Simpson which admittedly violated the Employer's policy prohibiting fraternization between employees. Policies prohibiting fraternization among employees are not uncommon. When sexual and/or romantic relationships develop in the workplace, the potential for problems can be far reaching. For example, one or both of the partners may become

upset or even violent if the relationship takes a turn for the worse. An example of this is Simpson's behavior in the present case which took place at work during one of the "break-ups." While Simpson's behavior certainly was not drastic, it *could* have been.[3] The point being, if Simpson and Claimant had not violated the policy, this simply would not be an issue.

Another equally important reason behind a policy prohibiting fraternization between employees is the increased risk of a sexual harassment claim or lawsuit being filed against the employer and the accompanying costs, etc., associated with such a lawsuit. The threat of litigation is even higher when the consensual relationship ends to the dismay of one of the partners. For example, *Grissom v. Metropolitan Gov. of Nashville*, 817 S.W.2d 679 (Tenn. Ct. App. 1991), involved a sexual harassment claim wherein:

> The jury was called upon to decide whether Mr. Hickman created a hostile work environment for Mrs. Grissom by making unwelcome sexual advances. Mrs. Grissom claimed that she suffered an emotional breakdown after enduring Mr. Hickman's sexual advances for eleven years. Mr. Hickman, on the other hand, claimed that he and Mrs. Grissom had been carrying on an affair for eleven years…. The jury clearly believed Mr. Hickman and decided that his sexual advances … were welcomed and that they did not create a hostile work environment for Mrs. Grissom.

*Grissom*, 817 S.W.2d at 684. *See also Chamblee v. Harris & Harris, Inc.*, 154 F. Supp.2d 670 (S.D.N.Y.2001) (permitting an employee who had previously had sexual relations with her supervisor to proceed to trial with her hostile work environment claim respecting his behavior toward her after she refused to continue the relationship); 45B AmJur2d *Job Discrimination* § 835 (2002)(Discussing the effect "of a prior consensual affair on an evaluation of whether conduct is 'unwelcome'"). We neither intend nor need to discuss each and every valid reason behind fraternization policies, but suffice it to say there are several.

Returning to the undisputed facts in the present case, it is abundantly clear that Claimant intentionally violated a known company policy on at least two occasions. The issue to be decided by the Trial Court was whether there was substantial and material evidence to support the Board's conclusion that Claimant's "conduct was a deliberate and direct violation of a known policy and substantially disregarded the employer interests. A preponderance of the evidence establishes misconduct by the claimant in this case." In our opinion, there is much more than just substantial and material evidence to support this conclusion by the Board. Our conclusion is not changed simply because the Employer believed Claimant quit before it had the opportunity to discharge her, even if that belief was mistaken. Likewise, whether Claimant's discharge is characterized as a direct or

---

[3]According to National Crime Victimization Survey published in December 2001 by the U. S. Department of Justice, Bureau of Justice Statistics, approximately 18,700 violent crimes, including nine deaths, are committed annually by "a current or former boyfriend, girlfriend, or spouse - an intimate - of the victim."

constructive discharge does not alter this final result. Therefore, we hold the Trial Court erred in reversing the Board's decision on these grounds.

In summary, we conclude that regardless of whether Claimant quit or was discharged, we find no basis for reversing the Board on any of the statutory grounds. There is substantial and material evidence in the record to support the Board's conclusion that she is disqualified from receiving benefits.

## Conclusion

The judgment of the Trial Court is reversed; the judgment of the Board of Review is reinstated in its entirety; and this cause is remanded to the Trial Court for further proceedings as are necessary, if any, consistent with this Opinion and for collection of the costs below. The costs on appeal are assessed against the Appellee, Lisa D. Huckabee.

_____
D. MICHAEL SWINEY, JUDGE