# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
January 23, 2013 Session

## JAMES TAYLOR v. DIVISION OF INTELLECTUAL DISABILITIES SERVICES, ET AL.

**Appeal from the Chancery Court for Davidson County**
**No. 091763IV     Russell T. Perkins, Chancellor**

---

**No. M2012-01089-COA-R3-CV - Filed March 22, 2013**

---

Employee of company providing services to an intellectually disabled adult appeals the finding that he committed abuse and neglect against the adult and the resulting placement of the provider's name on the abuse registry maintained by the Tennessee Department of Health.  Finding no error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirm**

RICHARD H. DINKINS, J., delivered the opinion of the court, in which PATRICIA J. COTTRELL, P. J., M. S., and FRANK G. CLEMENT, JR., J., joined.

David Ryan Grimmett, Nashville, Tennessee, for the Appellant, James Taylor.

Robert E. Cooper, Jr., Attorney General and Reporter; Martha A. Campbell, Assistant Attorney General, for the Appellee, Division of Intellectual Disabilities Services, a Division of the Tennessee Department of Finance and Administration.

## OPINION

### I. Background

James Taylor ("Appellant") is a principal and employee of TTI, a non-profit corporation which has a contract with the State of Tennessee to provide services to "T", an intellectually disabled adult;[1] Appellant is also T's father.  Adult Protective Services

---

[1]  When the events giving rise to this appeal began, TTI's services were rendered through the Division of Mental Retardation Services ("DMRS") of the Tennessee Department of Finance and

(continued...)

("APS"), a division of the Tennessee Department of Human Services responsible for investigating allegations of abuse and neglect against vulnerable adults, received a referral that on December 1, 2006, Appellant "pulled [T] out of the bathtub by his arms and dropped him on the floor. [T] received head injuries and was taken to the Emergency Room." An investigation was initiated by APS and the Department, and as a result, an investigative report was compiled which included the following additional incidents of alleged abuse: that on November 1, 2006, Appellant "threw [T] down onto the ground" and on November 15, 2006, Appellant "physically restrained [T] by holding him down in a prone restraint while sitting straddle over [him]."

The Department notified Appellant on August 17, 2007, of its intent to place his name on a registry maintained in accordance with Tenn. Code Ann. § 68-11-1001.[2] Appellant timely requested a hearing challenging his placement on the registry as provided by Tenn. Code Ann. § 68-11-1003.[3]

---

[1](...continued)
Administration. As a result of 2010 Tenn. Pub. Acts Ch. 1100 § 10, DMRS was established as a standalone department and renamed the Department of Intellectual and Developmental Disabilities effective January 15, 2011. In this opinion we shall refer to "the Department."

[2] The statutes relating to the abuse registry at issue in this case are located at Tenn. Code Ann. § 68-11-1001– 1005. Tenn. Code Ann. § 68-11-1001 provides that:

> (a) The department of health shall establish and maintain a registry containing the names of any persons who have been determined by Tennessee government agencies or any state or federal court or any administrative bodies to have abused, neglected, misappropriated or exploited the property of vulnerable individuals.
> (b) The names and information contained in this registry shall be available for public inspection as provided by this chapter.
> (c) The department may discharge its responsibilities under this part directly, or through interagency agreement; provided, that authorized access to the records by means of a single centralized agency shall be assured.

Tenn. Code Ann. § 68-11-1004 limits the ability of individuals placed on the registry to work with certain State organizations in an official or voluntary capacity. *See also* Tenn. Code Ann. § 33-2-1202.

[3] Tenn. Code Ann. § 68-11-1003 sets forth the procedure for placing an individual on the registry, notification to the individual and the entitlement to a hearing:

> (a) (1) Any state government agency that finds that an individual has committed abuse, neglect, or misappropriation or exploitation of the property of a vulnerable person shall notify the department of health concerning such individual in accordance with subdivision (a)(2). The department of health shall include the name of an individual on the registry when

(continued...)

On September 19, 2008, the Department initiated a proceeding to have the Department's determination of abuse affirmed and Appellant's name placed on the abuse registry affirmed. Appellant was served with the Notice of Charges as required by Tenn. Code Ann. § 4-5-307.

_____

(...continued)

it receives notification from an agency of Tennessee state government that the individual has been found by that agency, pursuant to that agency's procedures and definitions, to have committed abuse, neglect, or misappropriation or exploitation of the property of a vulnerable person.

(2) Notification shall consist of a copy of an emergency, initial, or final administrative order, a judicial order, or other evidence indicating that the agency has afforded the individual an opportunity for an administrative due process hearing pursuant to the requirements of the Uniform Administrative Procedures Act, compiled in title 4, chapter 5, part 3, or equivalent judicial or administrative procedures; provided, that nothing in this part shall require the state agency to establish any new procedures or to modify any existing procedures it may use for the provision of due process to the individual.

(3) Notification shall include the individual's last known mailing address, and the agency's definition of abuse, neglect, misappropriation or exploitation of property that it used in making the determination, and any other information that the department determines is necessary to adequately identify the individual for purposes of administrative hearings provided by this part, or to adequately identify the individual when inquiry to the registry is made.

(b) The department shall also include an individual's name on the registry when it receives a copy of a criminal disposition from the Tennessee bureau of investigation, other federal, state or local law enforcement agency, court, or criminal justice agency, indicating that a criminal disposition against the named individual was the result of an offense against a vulnerable person.

\* \* \*

(d) Upon entry of this information, the department shall notify the individual, at the individual's last known mailing address, of the individual's inclusion on the registry. Although the individual will not be entitled or given the opportunity to contest or dispute either the prior hearing conclusions, or the content or terms of any criminal disposition, or attempt to refute the factual findings upon which such are based, the individual may challenge the accuracy of the report that such a criminal disposition has occurred, or such hearing conclusions were made or any fact issue related to the correct identity of the individual. If the individual makes such a challenge within thirty (30) days of notification of inclusion on the registry, the commissioner, or the commissioner's designee, shall afford the individual an opportunity for a hearing on the matter that complies with the requirements of due process and the Uniform Administrative Procedures Act, compiled in title 4, chapter 5, part 3.

The original notice and Appellant's request for a hearing are not in the record; however, no issue is raised as to the compliance of the original notice with Tenn. Code Ann. § 68-11-1003.

A contested case was held in accordance with Tenn. Code Ann. § 4-5-301(a) before an administrative law judge on February 12, March 16, and March 30, 2009. The administrative law judge issued an Initial Order holding that Appellant abused T on November 1 and November 15, 2006, and neglected him on December 1, 2006, and ordering that Appellant's name be placed on the registry. The Initial Order became final on July 30. On August 7, 2009, Appellant submitted a "request to appeal decision"; the request was denied on August 21. Appellant thereafter filed a Petition for Review with the Davidson County Chancery Court; the Chancellor held that "substantial and material evidence in the record" supported the administrative law judge's conclusions and affirmed the order.

Appellant raises a single issue for resolution: "Whether the [administrative law judge] and the chancery court erred by finding that abuse and neglect occurred in a situation in which no injury or probable risk of harm was shown?"

## II. Standard of Review

The Uniform Administrative Procedures Act ("UAPA") provides for judicial review of administrative decisions in chancery court. Tenn. Code Ann. § 4-5-322. The decision of the chancery court may then be appealed to this Court in accordance with the Tennessee Rules of Appellate Procedure. Tenn. Code Ann. § 4-5-323. This Court, as well as the trial court, reviews administrative decisions under the narrowly defined standard of review codified at Tenn. Code Ann. § 4-5-322(h) as follows:

> The court may affirm the decision of the agency or remand the case for further proceedings. The court may reverse or modify the decision if the rights of the petitioner have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
>
> (1) In violation of constitutional or statutory provisions;
> (2) In excess of the statutory authority of the agency;
> (3) Made upon unlawful procedure;
> (4) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or
> (5)(A) Unsupported by evidence that is both substantial and material in the light of the entire record.
> (B) In determining the substantiality of evidence, the court shall take into account whatever in the record fairly detracts from its weight, but the court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact.

Tenn. Code Ann. § 4-5-322(h). Under the statute, "substantial and material evidence is 'such

relevant evidence as a reasonable mind might accept to support a rational conclusion and such as to furnish a reasonably sound basis for the action under consideration.'" *Clay Cnty. Manor v. State Dep't of Health & Env't*, 849 S.W.2d 755, 759 (Tenn. 1993) (quoting *Southern Ry. Co. v. State Bd. of Equalization*, 682 S.W.2d 196, 199 (Tenn.1984)). We review matters of law *de novo* with no presumption of correctness. *Davis*, 278 S.W.3d at 264 (citing Tenn. R. App. P. 13(d); *Cumulus Broad, Inc. v. Shim*, 226 S.W.3d 366, 373 (Tenn. 2007)).

### III. Analysis

**A. Abuse**

After reviewing the evidence of the events of November 1 and 15, the administrative judge found that T "surely felt pain or mental anguish . . . when [Appellant] grabbed him and yelled at him, and . . . when he was jerked from a vehicle, slung to the ground, with his arms pinned above his head, and then repeatedly pushed back into a recliner against his will." On that basis, the judge concluded:

> 22. Based on a review of the evidence overall, it is further CONCLUDED that [Appellant's] conduct on November 1 and 15, 2006 constitutes ABUSE [T.C.A. § 33-2-402(1)] of a vulnerable person, as such terms are defined in Tenn. Code Ann. § 68-11-1004(a)(3). Thus, the State MET its burden of proof, by a preponderance, as to abuse on November 1 and 15, 2006.[4]

As an initial matter, we address Appellant's contention that Tenn. Code Ann. § 33-2-402(1) requires a finding of "some form of injury" and that, in the absence of such a finding, the Department failed to prove he abused T.

Tenn. Code Ann. § 33-2-402(1) defines "abuse" as: "the knowing infliction of injury, unreasonable confinement, intimidation, or punishment with resulting physical harm, pain, or mental anguish." The plain language of the statute does not require a finding of physical injury in order to constitute abuse, rather, physical injury is one of several ways by which abuse may be found; the statute only requires that the action at issue result in physical harm, pain or mental anguish. Construed and applied in this manner, the statute is appropriately broad and consistent with the Department's duty at Tenn. Code Ann. § 4-3-2703 to "provide the best possible care for persons with intellectual and developmental disabilities in the state

---

[4] Tenn. Code Ann. § 68-11-1003(a)(1) provides that determinations of abuse or neglect will be made pursuant to the relevant agency's "procedures and definitions" of those terms. The Department utilizes the definition of abuse found in Tenn. Code Ann. § 33-2-402(1). Tenn. Code Ann. § 68-11-1004(a), referred to by the administrative law judge, defines "vulnerable person" and other terms used in the registry statutes; this provision has been recodified at Tenn. Code Ann. § 68-11-1002(6) since the issuance of the Initial Order.

by improving existing facilities, by developing future facilities and programs, and by adopting a preventive program for intellectual and developmental disabilities, all as provided in title 33 . . . ." We discern no reason to construe Tenn. Code Ann. § 33-2-402(1) to impose the requirement of a physical injury in all circumstances, particularly in light of the requirement that there be a finding of "physical harm, pain, or mental anguish."

We now review the evidence to determine whether the findings with respect to the events of November 1 and 15 are supported by substantial and material evidence and whether Appellant's treatment of T constituted abuse within the meaning of the statute.

Gayla Hill, a service provider for T, testified that on November 1, 2006, she was applying medicine to T's leg when he began slamming the door to the bathroom. Hill testified:

Q: And while [T] was in the bathroom, how did the door-slamming controversy come up? Just go ahead and tell me in your own words.
A: When we went to the bathroom, [T] slammed the door. [Appellant], on the other side, was telling him "Don't slam the door," but he would open it, and then when he would turn around, [T] would slam the door again. And then he just came in there and grabbed him by his neck and slammed him on the floor.

\* \* \*

Q: [T] is a pretty good-sized fellow, isn't he?
A: Yes.
Q: And when you were indicating there, the court reporter can't pick up what you were doing, but it looked to me like you were demonstrating that [Appellant] had his hands in the vicinity of his neck?
A: Yes.
Q: Just tell the judge how he grabbed [T].
A: He just grabbed him by his neck and slung him around, and he landed on his back.
Q: Okay. Was that a fairly forceful impact?
A: Fairly forceful.
Q: Okay. Now, was [Appellant] yelling at [T] during this incident?
A: Yes.

Hill further testified as follows: On November 15 T refused to get out of the truck after an outing into the community and she called Appellant to come assist her; when Appellant arrived he grabbed T's arm several times and jerked him out of the truck; as T walked up to the house, Appellant slapped him in the back of the head; T was "upset" and sat down in his recliner; T became angry and when he attempted to leave the recliner

Appellant would "put him back in it"; and when T got up again, Appellant "put him on the floor and straddled him for about 20 minutes." The administrative law judge found Hill's testimony to be credible.

Appellant was called to testify by the Department and asked about the events at issue. Appellant stated that he was unable for various reasons to answer many of the questions posed; however, he did testify that, from 2006 to the time of the hearing, he never hit, slapped, or struck T, grabbed T and threw him to the ground, or pulled him from a truck.[5]

Dr. Qusayy Godbolt, a behavioral analyst, testified that a behavioral analyst observes and assesses a client's behavior; draws up a plan for "reducing the frequency and intensity of various identified target behaviors" known as a Behavior Support Plan ("BSP"); trains the staff who work with the client on the plan; and then observes the plan's implementation. Dr. Godbolt, who was assigned to work with T, testified that he conducted several trainings for the staff on T's BSP and that he went to T's home on a weekly basis. T's BSP, according to Dr. Godbolt, did not allow for any striking, hitting, or slapping of T, nor did it allow for any form of restraint. Dr. Godbolt testified that the type of restraint used by Appellant against T, as testified to by Hill, is known as a "prone restraint" and is especially dangerous. Dr. Godbolt also testified that T exhibited the following reaction to aggressive behavior

> What I found with [T] is that the more you got heightened, the more he got heightened. So if he's refusing to get out of the car, for instance, and I get excited and I say, "[T], you're going to get out of that car," and he says, "No, I ain't getting out of the car," "Yes, you are getting out of the car," to where that if you – I just think that it would create an environment where someone could get hurt. That's the main thing.

Dr. Nancy Kirby, the Director of Psychology and Intensive Consultation Team for the Department, opined that Appellant's conduct in removing T forcibly from the vehicle, striking T on the back of the head, pushing T back into the recliner, and sitting astride T while restraining him on the ground, would all qualify as abuse under the definition used by the Department.

The foregoing is substantial and material evidence that supports the finding that T felt pain as a result of Appellant's conduct. Likewise, this evidence supports the finding that T

---

[5] The administrative law judge concluded that "the explanation for [Appellant's] exceptionally frequent lapses of memory and seeming difficulty understanding questions is that [Appellant] was being less than truthful and forthcoming"; the judge also summarized the evidence which stood in opposition to what the judge called Appellant's "blanket denials of all the alleged conduct."

experienced mental anguish in response to Appellant's conduct.[6] Accordingly, we affirm the holding that Appellant's conduct on these two occasions met the statutory definition of abuse.

## B. Neglect

After reviewing the evidence of the events of December 1, the administrative judge found that:

> [Appellant's] concern that he "may have killed T" stands in stark contrast to [Appellant's] actions in stopping at Wal-Mart to select a radio or CD player, waiting in line, and then returning to the motor vehicle that was transporting T to the ER. [Appellant] also did not telephone an ambulance for T, the evening of December 1.
>
> * * *
>
> No proof was submitted that [Appellant] is a licensed physician, nurse, EMT, or other medical professional, with knowledge sufficient to determine the extent of head injury/ability to assess the risk associated with delay in assessment of a head injury, independently.

Based upon these findings, the administrative law judge concluded:

> . . . [Appellant's] conduct on December 1, 2006, <u>outside, after, or beyond</u> the bathroom, of stopping at Wal-Mart to buy a radio or CD player, when T had a bleeding head injury, failing to telephone for an ambulance, and failing to consult with medical personnel regarding the appropriateness of driving T to the ER DOES constitute NEGLECT [T.C.A. § 33-2-402(5)] of a vulnerable person . . . . [Appellant] failed to use reasonable care to secure timely medical attention for T. Thus, the State MET its burden of proof, by a preponderance, as to neglect occurring outside, after, or beyond the bathroom, on December 1, 2006.

The order included a footnote stating, "Head injuries sometimes have serious, even deadly, after effects that are far more serious than first appears."

---

[6] The term mental anguish is undefined by Black's Law Dictionary, but has been used synonymously with "emotional distress." *Black's Law Dictionary* (9th ed. 2009); *Salee v. Barrett*, 171 S.W.3d 822, 824 (Tenn. 2005) (stating that this Court would use "the terms 'infliction of mental anguish" and "infliction of emotional distress" interchangeably throughout"). Emotional distress is "a highly unpleasant mental reaction (such as anguish, grief, fright, humiliation, or fury) that results from another person's conduct." *Black's Law Dictionary* (9th ed. 2009).

In making determinations of neglect, the Department utilizes the definition found in Tenn. Code Ann. § 33-2-402(5), which defines neglect as the "failure to provide goods or services necessary to avoid physical harm, mental anguish, or mental illness, which results in injury or probable risk of serious harm." Appellant contends that the State failed to show that his actions "result[ed] in injury or probable risk of serious harm" as required by the statute.

Appellant testified that on December 1, 2006, he went to T's home to assist service provider Shelley Knalls in getting T to leave the bathtub; as Appellant retrieved T from the bathtub, T fell and struck his head. Appellant then called Donna Biggs, another of T's service providers, to request that she come to the home. Appellant decided to take T to the emergency room along with Biggs, and stopped at Wal-Mart to purchase a radio for T on the way. At the hearing, Appellant explained his decision to stop as follows: "[T] had to have something for his attention. If we wanted to get [T] in the doctor's office, we had to get him a radio. You have to bribe [T] and get what you want."

Melanie Wilson, an investigator for the Department, testified that, as a part of the investigation, she interviewed Knalls and took a written statement regarding the incident; the statement was admitted into evidence because Knalls could not be located to testify at the hearing. Knalls wrote in the statement:

> I came to the bathroom and [T] was lying on his side facing the bathroom door. [T's] forehead was bleeding. I asked [Appellant] what happened and what he hit his head on. [Appellant] was trying to get [T] up and sit him on the toilet. [T] was having difficulty standing. [Appellant] finally was able to sit him on the toilet and [Appellant] asked me to stay with him while he used the phone. . . . I'm asking [Appellant] "What did he hit his head on?" [Appellant] said he didn't know. [Appellant] was trying to get [T] up. I got a rag and put it on [T's] head. [Appellant] went into the living room and called Donna (weekend staff member) and said I need you to come over here I think I hurt [T]. . . . Donna came to the house within about 10 min. [Appellant] left Donna, [T], and I at the house while he went to the hospital to prepare for [T] to be taken. I sat with [T] and held a cold rag on his head. [Appellant] returned and got [T] ready to leave. I got my purse to go and [Appellant] said I needed to stay at the house. He and Donna would take him. I insisted I need to go and [Appellant] told me I could not. They left a short time later.

Knalls also wrote that she was "not allowed to write an incident report" with respect to the incident, nor was she "allowed to see the incident report or see what was in it."

Medical records confirmed that T sustained a contusion to his forehead and was treated in the emergency room. While there, emergency room staff applied topical medication to T's wound and bandaged it, and T was released with instructions on head injury and wound care. Dr. Godbolt testified that he saw T on the day following his fall and observed that T had "raccoon-type bruises under the eyes" and a "big bruise on his forehead."

Hill testified that she was not on duty when the bathroom incident occurred, but that Appellant called her the following day to tell her that T fell in the bathtub and that Appellant had to take him to the emergency room. Hill testified that in this phone call Appellant stated that "he thought he killed [T]."

The forgoing is substantial and material evidence which supports the finding that T had a bleeding head wound and that Appellant delayed care for that wound by failing to call medical professionals, by failing to call 911, and by electing to stop at Wal-Mart while driving T to the hospital. Such failure to provide timely medical care to a bleeding head injury placed T at "probable risk of serious harm" as contemplated by the statutory definition of neglect. Accordingly, we affirm the trial court's conclusion that Appellant's conduct constituted neglect.

### III. Conclusion

For the reasons stated above, we affirm the administrative law judge's decision that Appellant abused and neglected T and the placement of Appellant's name on the abuse registry as required by Tenn. Code Ann. § 68-11-1001.

_____
RICHARD H. DINKINS, JUDGE

-10-