


# TENNESSEE DIVISION OF WORKERS' COMPENSATION Time: 12:17 PM
# WORKERS' COMPENSATION APPEALS BOARD

| | | |
|---|---|---|
| Employee: Luciano Gonzales | ) | Docket No. 2014-06-0015 |
| | ) | |
| Employer: ABC Professional Tree Services | ) | State File No. 57318-2014 |

In accordance with Rule 0800-02-22-.02(6), please find attached the Workers' Compensation Appeals Board's Order and Opinion Affirming and Remanding Interlocutory Order of Court of Workers' Compensation Claims in the referenced case.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the Order and Opinion Affirming and Remanding Interlocutory Order of Court of Workers' Compensation Claims was sent to the following recipients by the following methods of service on this the 10th day of November, 2014.

| Name | Certified Mail | First Class Mail | Via Fax | Fax Number | Via Email | Email Address |
|---|---|---|---|---|---|---|
| Landon Lackey, Employee's Attorney | | | | | X | landon@rockylawfirm.com |
| Nicole M. Grida, Employer's Attorney | | | | | X | Nicole.grida@zurichna.com |
| Kenneth M. Switzer, Chief Judge | | | | | X | Kenneth.Switzer@tn.gov |
| Penny Shrum, Clerk, Court of Workers' Compensation Claims | | | | | X | Penny.Patterson-Shrum@tn.gov |

Matthew Salyer

Matthew Salyer
Clerk, Workers' Compensation Appeals Board
220 French Landing Dr., Ste. 1-B
Nashville, TN 37243
Telephone: 615-253-1606
Electronic Mail: Matthew.Salyer@tn.gov

FILED

November 10, 2014

TENNESSEE
WORKERS' COMPENSATION
APPEALS BOARD

Time: 12:17 PM



**TENNESSEE DIVISION OF WORKERS' COMPENSATION**
**WORKERS' COMPENSATION APPEALS BOARD**

| | | |
|---|---|---|
| Employer: ABC Professional Tree Services | ) | State File No. 57318-2014 |
| | ) | |
| Employee: Luciano Gonzales | ) | Docket No. 2014-06-0015 |
| | ) | |
| | ) | |
| Appeal from the Court of Workers' | ) | |
| Compensation Claims | ) | |
| Kenneth M. Switzer, Judge | | |

---

**Affirmed and Remanded – Filed November 10, 2014**

---

**ORDER AND OPINION AFFIRMING AND REMANDING**
**INTERLOCUTORY ORDER OF COURT OF WORKERS' COMPENSATION**
**CLAIMS**

This interlocutory appeal involves a tree-trimmer who suffered a broken leg as a result of falling from a tree when he accidently severed a lanyard affixed to his safety belt and harness. The employer denied the claim, asserting the employee's injury was due to the employee's willful misconduct and/or willful failure or refusal to use a safety device when he failed to tie-in to a climbing rope before engaging in cutting. The court of workers' compensation claims found that the employee chose to disregard the tie-in policy, resulting in the accident and injury, and that the employer successfully asserted the defense of willful misconduct. The employee appealed. Having carefully reviewed the record, we affirm the decision of the court of workers' compensation claims.

Judge David F. Hensley delivered the opinion of the Appeals Board, in which Judge Marshall L. Davidson, III, and Judge Timothy W. Conner, joined.

Landon Lackey, Nashville, Tennessee, for the employee-appellant, Luciano Gonzales

Nicole M. Grida, Memphis, Tennessee, for the employer-appellee, ABC Professional Tree Services

1

## Factual and Procedural Background

Luciano Gonzales ("Employee") is a 27-year old resident of Oak Grove, Kentucky. At the time of his July 1, 2014 injury, Employee had been employed by ABC Professional Tree Services ("Employer") for almost two years as a tree-climber/trimmer.

On August 26, 2014, Employee filed a Petition for Benefit Determination ("PBD") seeking temporary disability benefits and medical benefits. Employee alleged in his PBD that he was injured July 1, 2014, when he fell while trimming a tree within the course of his employment. On July 30, 2014, Employer filed a Notice of Denial of Claim wherein Employer asserted Employee's claim "is being denied as evidence supports willful misconduct as claimant violated safety procedures and intentionally caused . . . harm to himself."

Following an unsuccessful mediation, a Dispute Certification Notice ("DCN") was issued September 29, 2014, by a workers' compensation mediator. The DCN identified the disputed issues to include medical benefits, temporary disability benefits and compensability. Defenses identified in the DCN were limited to "willful misconduct / willful failure or refusal to use safety device." Employee filed a request for expedited hearing September 29, 2014, and the trial judge exercised his discretion to conduct a full evidentiary hearing on the disputed issues as authorized by Tennessee Code Annotated section 50-6-239(d) (2014).[1]

The hearing was conducted telephonically on October 18, 2014. There were technical challenges due to the hearing being conducted telephonically, and we note that no objection was raised to the witnesses testifying by telephone or to the telephonic hearing.

Three witnesses testified. Employee's witnesses included himself and a former co-worker, Anthony Kelly. Employer's Safety Director, Rick Bentley, testified on behalf of Employer. Employee acknowledged in his testimony that he received training as to the safety rules required for his position as a tree-trimmer. Employer's "Climber Trimmer Proficiency Guidelines" were introduced into evidence, which Employee admitted reviewing and initialing. He also admitted successfully completing the

---

[1] The trial judge has the authority to "issue an interlocutory order either awarding or denying temporary disability or medical benefits based on a review of the documents submitted and without convening a formal hearing." Tenn. Comp. R. & Regs. 0800-02-21-.02(13) (2014). *See also* Tenn. Code Ann. § 50-6-239(d)(2) (2014). However, the trial judge also has the "discretion to convene a hearing of a motion for temporary disability or medical benefits if the judge determines that convening a hearing is necessary to determine the issues presented." Tenn. Comp. R. & Regs. 0800-02-21-.02(13) (2014). In this case, the trial judge chose the latter option and held a hearing.

"Climber Trimmer Qualification Exam" in March and April of 2013, which was also introduced as an exhibit.

Employee testified that on the date of injury, he was supervised by a foreman named "Luis,"[2] who Employee testified had worked as a supervisor for about two weeks. According to Employee, Luis spoke Spanish and could not speak English, and neither Employee nor anyone else in the crew could speak Spanish. Employee testified, "I know a little bit of Spanish. I don't know enough. But I understand a couple of words."

Employee explained that on the day of the accident, the tree that the crew was assigned to trim could have been trimmed using a hydraulic lift bucket, but the hydraulic was not working, "so they had me go and climb it." Employee described the events leading to the accident as follows:

> As I was going up to trim it, I was going to go all the way up and tie-in. He [Luis] was rushing me, telling me to, in Spanish, "Ándale, ándale, corte rápido," which means cut really fast. Cut it, like, as I was going up. So I just -- I did what he said, and I was trimming the tree as I was going up, and that's when I had the accident. I trimmed the limb and -- and then I fell out of the tree.
>
> And so pretty much I was just doing what I was told, you know. If he would not have rushed me, I could have climbed -- I could have tied -- went all the way to the top, tied-in and then kind of trimmed coming down, you know. But he had me trim as I was just -- I just had my safety hangers on. I wasn't fully tied-in because I was listening to what he said. I was going to -- I was spiking it up and I had my lanyard on, and as I was going up, he said . . . .
>
> BY MR. LACKEY:
> Q.    Mr. Gonzales?
>       (Technical interruption.)
> . . . .
> THE WITNESS:  Okay. I had my lanyard on, and I was -- I was climbing up it and I was climbing -- as I was climbing up to tie-in to go all the way up -- first you got to tie-in. That's what I was going to do. That was my first step as I was -- as I was using pole -- pole spikes, the company-issued pole spikes. . . . I was climbing up it with my lanyards. And as I was going up, the foreman was rushing me to, in Spanish, "Ándale, ándale. Rápido corte," you know, telling me to cut it really fast. And that's when I had the

---

[2] Employee testified he believed the supervisor/foreman's surname is Ramirez. Employer's Position Statement identifies him as Luis Miranda. Employer's witness, Rick Bentley, said he did not know the supervisor/foreman's surname, but believed it to be Ramirez.

3

accident.  I never -- if I'd never been rushed I would never had the accident.  I always climb a tree safely.  You know, I know the rules.  And the man was rushing me, and I was just doing what he was -- said.  You know, taking his judgment on seeing the tree as I was going up, something I've never done.  And I always tie-in, because I know -- you know, I'm scared of falling.  I'm not going to hurt myself.  But I was just listening to what my foreman said.

On cross-examination, Employee explained that he knew little Spanish and asserted that his supervisor never gave him the chance to go up and tie-in:

Q.  You know limited Spanish, or are you fluent in Spanish?
A.  I know -- I know very little Spanish.  I know --
Q.  Okay.
A.  -- a few words.
Q.  Okay.  And with regard to the few words that you heard your supervisor or your foreman say to you, it was to the extent of saying, "Get up," or "Get up the tree" or "Hurry up"; is that accurate?
A.  "Ándale," which means hurry up.
Q.  Uh-huh.
A.  "Rápido" means faster.
Q.  Uh-huh.
A.  And "corte," that means cut.
Q.  Okay.  So "Hurry up, cut" and "fast"?
A.  Yeah.
Q.  At no point did you ever hear him say:  Do not use your -- do not tie-in, did you?
A.  No.  He --
Q.  Okay.  So he never -- he told you to hurry up.  He never told you not to tie-in; he never told you not to go to the top of the tree, did he?
A.  Well, as I was going up, he was screaming at me, hollering at me to hurry up, so that's what I was listening to, what he was saying.  And he was telling me to cut.  What I -- what -- where I started trimming at, I hadn't been tied-in yet.  He was telling me to cut as I was going up, but he never gave me the chance to really go up and tie-in before rushing me.
. . . .
Q.  Okay.  But one thing you do know is that you, in your two years of working there, you know that you're supposed to go to the top and tie-in, don't you?
A.  Yes, I know to go in and tie-in, but I was just listening to what my foreman was saying at the time.
Q.  And you know to go and tie-in because you were taught to go and tie-in; isn't that correct?

A. Well, there's different ways of climbing a tree. You can use a bell ball (phonetic), which the company, they never use that. You can -- you can spike up it.

Q. Uh-huh.

A. But I seen them guys do it plenty of times the way this -- kind of spiking up it. But yes, you're correct.

Q. Well, is it your testimony or not that you knew that you were supposed to tie-in?

A. Yes, I knew that I was --

Q. Okay. And you knew that you were supposed to tie-in because you were trained to tie-in; isn't that correct?

A. Correct.

. . . .

Q. Okay. So you're testifying today under oath that you were in fact properly tied-in and your lanyard was sufficient for tie -- being tied-in per company policy, is that your testimony?

A. Correct.

Q. Okay

A. I was tied-in to the tree with my lanyard.

Q. Okay. So when it comes to being tied-in, you -- you understand that a lanyard is not sufficient to be tied-in?

A. No, a lanyard is sufficient.

. . . .

Q. What were you -- oh. You said you were cutting on your way up. How were you cutting?

A. Well, there's some limbs in -- you know, in the way as I was going up before I can totally tie-in. But the foreman was asking me to trim those limbs before I went all the way up.

Employee was asked whether he was "aware of the zero-tolerance, that in the event that you're not properly tied-in, that you would in fact be terminated." Employee responded, "I'm saying no, I was not aware of that." Employee was asked if the foreman had not rushed him, "is it your testimony that you would still have cut that tree in the same manner?" Employee responded:

A. If he wouldn't have rushed me, I could have did things differently.

Q. Uh huh. And the things you would have been diff- -- done differently, is you would have tied-in with a climbing rope, wouldn't you have?

A. Yes.

On re-direct, Employee was asked about Employer's Guidelines and how often after Employee completed his exam that the Guidelines were brought up. Employee responded, "not often."

5

Following questioning by counsel, the trial judge questioned Employee:

THE COURT:  All right.  And when you say you're  -- you have a lanyard on, that's a little mysterious to me.  Are you indicating to me that -- that the lanyard is wrapped around the tree, and that as you climb with the spikes, you move that up, and that's the way you're tied-in to the tree; is -- am I understanding that correctly?

THE WITNESS:  Yes, sir.

THE COURT:  Okay.  And what is -- what is the -- when you referred to a climbing rope, what does that mean?

THE WITNESS:  A climbing rope is a -- is a rope that goes on your harness, and it -- usually you use it when you're coming down the tree.  When you're climbing up the tree, you don't use it, but once you're -- I mean, you can use it going up a tree, because you can use a throw ball.  Well I'm not good with a throw ball, so I was trained to use the -- the pole spikes.  I mean, not the pole -- yeah, the pole spikes and the -- the -- and the lanyard.  But you can also -- you can use a throw ball and you can throw it in the crotch of the tree and the throw ball will come down and you put your -- the rope in it and you could tie-in with that as if -- well, I was never trained to use a throw ball.

THE COURT:  Okay.  So the normal course of events is to use -- using your lanyard and pole spikes to climb --

THE WITNES:  Yes.

THE COURT:  -- to the top of the tree and then tie off once you get up there to the climbing rope; is that -- do I understand that correctly?

THE WITNESS:  Yes, sir.  You can use your -- you take your climbing rope with you.

THE COURT:  Okay.

THE WITNESS:  And then once you get up there, you find a crotch and then you tie-in and then, you know, start doing your trimming.

THE COURT:  All right.  Now, it's still not clear to me how or why you fell.  I -- I -- did you just slip and fall?  Did -- I mean, how -- why did you fall?

THE WITNESS:  I was cutting a limb and I cut -- I guess I cut through the lanyard, and I fell.  That's all I know.  Because I kind of --

THE COURT:  All right.  So at --

. . . .

THE COURT:  -- at the time you were cutting the limb -- I'm trying to understand this.  At the time you were cutting the limb, was the lanyard wrapped around the tree and hooked onto your harness?

THE WITNESS:  Yes, sir.

6

THE COURT: So if you had not cut that, you would not have fallen; am I understanding that correctly?

THE WITNESS: Correct.

Employee testified the foreman's role is to plan and lead how a job will be completed with safety in mind, and that it is important to listen to the foreman, or "the company will discipline you." Employee stated, "I did what he said and I had an accident." Employee was terminated three days after the accident for his failure to follow safety rules.

Employee's only other witness was a former co-worker, Anthony Kelly. Kelly is a certified truck driver and not a tree-trimmer. He testified he was one of three workers present on the day of the accident. He recalled the foreman, Luis, whom he said cannot speak English, saying, "ándale, ándale," to Employee prior to the fall. He testified that he presumed Employee "had slipped and fell because he was trying to go up the tree as fast as he could." When asked whether he recalled the foreman saying anything else to Employee, he responded, "well, like I said he was speaking in Spanish, you know, 'ándale, ándale, quatros [sic], quatros [sic].' I don't know what 'quatros [sic]' means." Kelly testified that "the foreman's role is to give us safety information before we start a job, which he can't do because he can't speak English." He testified that employees would be disciplined if they did not listen to the foreman.

On cross-examination, Kelly admitted that he had been terminated for reasons unrelated to Employee's accident. Contrary to his testimony on direct examination, he testified that he actually saw Employee's fall: "my testimony is that he was trying to get up -- get up around the tree and in a fashion where Mr. Luis was telling him to." When asked what caused Employee to fall, he responded, "by [Employee] trying to move faster than he could."

Employer's only witness was Rick Bentley, Employer's Safety Director. He testified he is responsible for safety and training for the entire company. He said employees are trained in stages, and at the end of every stage they are tested and must be "proficient" to move on to the next stage. He testified training to be a climber lasts anywhere from sixty (60) days to six (6) months, followed by a written exam. He testified Employee was a "Climber/Trimmer Trainee."

Bentley testified that OSHA regulations require tying-in any time a trimmer is higher than four feet off the ground. He testified Employer "has a lifesaving rule that we require our people to be tied-in from the time they leave the ground until the time they return back to the ground safely." He explained "tied-in" as follows: "tied-in means that you are tied-in with a climbing rope or safety straps, and before any work is performed, you have to be -- it's mandatory that you're tied-in with a climbing line or a lifeline." When asked what type of safety mechanisms or lines Employee should have used in

7

trimming limbs, Bentley responded: "[w]ell, he should have had a climbing line. And if he's cutting in close proximity, as he described, at waist level to that climbing line, he should have also had a safety strap in addition to the climbing line."

Bentley opined that Employee's use of the safety lanyard without tying-in to a climbing rope was insufficient "because it is a secondary safety measure." He explained that even when the safety lanyard is used properly, the body can go limp and the trimmer can still fall. He testified that before trimming, it is mandatory to tie-in with a climbing line or "life line," and he emphasized that Employee's safety strap would have been the secondary tie-in.[3]

Bentley's direct examination included the following:

Q. Have you had instances where employees have ascended or cut limbs and only used a safety lanyard?
A. In any situation we've had in the past where anybody violated a life-saving rule that employee is terminated.
Q. And you have in fact in the past terminated people for violating this safety rule?
A. Yes, for violating life-saving rules, that's correct.

Bentley testified "there is no exception to the tie-in rule and employees will be terminated if the life-saving rule is violated." He said "nothing trumps Employer's safety rules." Bentley testified that all employees are trained in the "ABCs of Life,"[4] which explain the discipline policy regarding safety rule violations. He testified that Employees must be able to recite the "ABCs of Life" before they are allowed to work in the field.

On cross-examination Bentley testified that he works from the home office in Texas, but that much of his time is spent inspecting crews all over the country. He was neither present when Employee's accident occurred, nor could he recall if he ever met Employee. He said Employee made a choice not to tie-in first. He said all employees are given "stop-work" authority whenever they feel someone's safety is in jeopardy, and that employees "quite frequently" invoke the "stop-work" authority. When asked how long it takes to tie-in, Bentley testified that "once you're in a position in a tree as [Employee] was, it's a matter of putting a rope around a tree, snapping it on the -- a snap and tying one knot, so I would say 30 seconds."

Following the hearing, the trial judge filed an interlocutory order on October 16, 2014, finding that Employee clearly had knowledge of the 100% tie-in policy as evidenced by his training and test scores; that Employee's own testimony evidenced a

---

[3] Employer's Safety Director and its counsel referred to the rule at issue interchangeably as a "tie-in" rule or policy and as the "100% tie-in" rule or policy.
[4] This document was not introduced into evidence.

8

clear understanding of the danger involved in violating the rule; and that the uncontroverted proof of Employer that the rule was strictly enforced on a regular basis established "bona fide" enforcement. Lastly, the trial judge concluded that Employee lacked a valid excuse for violating the rule. Finding that the Employer successfully raised the willful misconduct affirmative defense, the trial judge determined he need not reach the issues of temporary disability benefits and medical benefits and denied Employee's interlocutory request.

Employee filed a timely request for an appeal on October 22, 2014. A transcript of the proceedings was prepared from an audio recording by a certified court reporter. On October 31, 2014, the record was received and docketed by the Clerk of the Appeals Board. For the reasons explained below, the trial judge's decision is affirmed.

## Standard of Review

The standard of review to be applied by this Board in reviewing a trial judge's decision is statutorily mandated and limited in scope. Specifically, "[t]here shall be a presumption that the findings and conclusions of the workers' compensation judge are correct, unless the preponderance of the evidence is otherwise." Tenn. Code Ann. § 50-6-239(c)(7) (2014). The trial judge's decision must be upheld unless "the rights of the party seeking review have been prejudiced because findings, inferences, conclusions, or decisions of a workers' compensation judge:

(A) Violate constitutional or statutory provisions;
(B) Exceed the statutory authority of the workers' compensation judge;
(C) Do not comply with lawful procedure;
(D) Are arbitrary, capricious, characterized by abuse of discretion, or clearly unwarranted exercise of discretion; or
(E) Are not supported by evidence that is both substantial and material in the light of the entire record.

Tenn. Code Ann. § 50-6-217(a)(2) (2014).

In applying the above standards, courts have construed substantial and material evidence to mean "such relevant evidence as a reasonable mind might accept to support a rational conclusion and such as to furnish a reasonably sound basis for the action under consideration." *Clay County Manor, Inc. v. State of Tennessee*, 849 S.W.2d 755, 759 (Tenn. 1993)(*quoting Southern Railway Co. v. State Bd. of Equalization*, 682 S.W.2d 196, 199 (Tenn. 1984)). Like other courts applying the standard embodied in section 50-6-217(a)(2), the Board will not disturb the decision of the trial judge absent the limited circumstances identified in the statute.

9

## Analysis

Although the Workers' Compensation Act creates a system in which employees can recover benefits for work-related injuries without regard to fault, *see* Tennessee Code Annotated section 50-6-103(a) (2014), there are circumstances in which an employee cannot recover for injuries that would otherwise be compensable due to the employee's conduct. In this instance, Employer contends that Employee cannot recover benefits because Employee engaged in willful misconduct and willfully failed or refused to use a safety device.

Tennessee Code Annotated section 50-6-110(a) (2014) provides in subsections (1) and (4) that no compensation shall be allowed for an injury or death due to the employee's "willful misconduct" or the employee's "willful failure or refusal to use a safety device." These provisions condition the preclusion of compensation in circumstances where the alleged injury was "due to" the willful misconduct or the willful failure or refusal to use a safety device. In this context, "due to" means the proximate cause of the injury or death and not merely a remote or contributing cause. *See Mitchell v. Fayetteville Pub. Utils.*, 368 S.W.3d 442, 449 (Tenn. 2012)(citing *Coleman v. Coker*, 204 Tenn. 310, 321 S.W.2d 540, 542 (Tenn. 1952) and *Overall v. S. Subaru Star, Inc.*, 545 S.W.2d 1, 4 (Tenn. 1976)(when a statute uses the language "due to," this refers to proximate cause)).

If an employer defends on the grounds that the injury arose from willful misconduct or from the willful failure or refusal to use a safety device, the burden of proof is on the employer to establish the defense. Tenn. Code Ann. § 50-6-110(b) (2014). Thus, the "burden of proof is on the employer to demonstrate that the willful misconduct or the willful failure to use a safety appliance was the proximate cause of the injuries."[5] *Mitchell*, 368 S.W.3d at 448-449. Prior to the *Mitchell* case, the analyses of an employer's willful misconduct defense and an employer's defense of willful failure or refusal to use a safety device differed. There was a three-pronged test first announced in *Insurance Co. of America v. Hogsett*, 486 S.W.2d 730, 733 (Tenn. 1972), to assess an employer's defense of willful misconduct under the statute as it then existed.[6] In *Nance v. State Indus., Inc.*, 33 S.W.3d 222, 226 (Tenn. Workers' Comp. Panel 2000), the Special Workers' Compensation Appeals Panel fashioned a test for the more specific statutory defense of willful failure or refusal to use a safety appliance, which required the

---

[5] Tennessee Code Annotated section 50-6-110(a) was amended in 2009 to, among other changes, substitute "safety device" for "safety appliance." The provisions of section 110(a) were not altered by the amendments to the Workers' Compensation Act that became effective July 1, 2014.

[6] The Court stated as follows: "we are of the opinion the employer has shown the three elements, as deduced from the opinions of this Court, constituting willful misconduct as contemplated by the statute and they are: (1) an intention to do the act, (2) purposeful violation of orders, and (3) an element of perverseness." *Hogsett*, 486 S.W.2d at 733.

employer to establish four elements in order to successfully defeat compensability.[7]  In *Mitchell*, the Supreme Court commented that the *Nance* holding "illustrates a close relationship between willful misconduct and willful failure or refusal to use a safety appliance."  *Mitchell*, 368 S.W.3d at 452.  Noting that *Larson's Workers' Compensation Law* (Matthew Bender, rev. ed.) [hereinafter Larson's] also recognizes "the blurred line between the statutory defenses of willful misconduct and the willful failure or refusal to follow a safety regulation or policy," the Court quoted Larson's conclusion that if the willful misconduct defense amounts to no more than a violation-of-safety-regulation defense, "it would be much better to say so in plain language and put an end to the litigation inspired by the vague breadth of the phrase 'wil[l]ful misconduct.'" *Id.* (quoting Larson's § 34.02).

In *Mitchell*, the Supreme Court noted Larson's suggestion that the elements required to assert successful defenses for willful misconduct, willful disobedience of safety rules, and willful failure to use a safety device should be determined by the same standard, and the Court adopted a single standard "for this and future cases involving these statutory defenses."  *Id.* at 452-53.  Thus, to meet its statutory burden of proof to establish the defense of willful misconduct or willful failure or refusal to use a safety device, an employer must prove the following four elements:

(1)  the employee's actual, as opposed to constructive, notice of the rule;
(2)  the employee's understanding of the danger involved in violating the rule;
(3)  the employer's bona fide enforcement of the rule; and
(4)  the employee's lack of a valid excuse for violating the rule.

*Mitchell*, 368 S.W.3d at 453.

In the instant case, Employer asserts that it satisfied its burden in proving each of the four elements to deny Employee's claim.  The trial judge found that Employer met its burden to prove each element, and we agree.

## 1.  Employee's Actual, as Opposed to Constructive, Notice of the Rule

Employer asserts there is a "100% tie-in" rule that Employee willfully chose to ignore.  Employee was questioned about an examination he took at the completion of his training with Employer in 2013 and about one of the true-false questions on the exam.  Employee acknowledged it is "true" that Employer has a 100% tie-in policy, but

---

[7] The Panel identified these four elements the employer must establish to avoid payment under the statute: (1) at the time of the injury the employer had in effect a policy requiring the employee's use of a particular safety appliance; (2) the employer carried out strict, continuous and bona fide enforcement of the policy; (3) the employee had actual knowledge of the policy, including a knowledge of the danger involved in its violation, through training provided by the employer; and (4) the employee willfully and intentionally failed or refused to follow established policy requiring use of the safety appliance. *Nance,* 33 S.W.3d at 226.

Employee never was asked what the 100% tie-in policy is or what constituted 100% tie-in. He testified he was tied-in with his lanyard as he climbed the tree and while he was cutting the limb, but he admitted that "where I started trimming at, I hadn't been tied-in yet." Employee testified the foreman never gave him "the chance to really go up and tie-in before rushing me." Employee admitted he learned from his two years of work with Employer that "I know to go in and tie-in," and he said there were some limbs "in the way as I was going up before I can totally tie-in." When questioned by the trial judge about the "normal course of events," Employee admitted it was normal to climb to the top using pole spikes and a lanyard and to tie off to the climbing rope once you get there before you start trimming. However, Employee also testified it is proper to trim as you are ascending a tree. Employer's Safety Director, Rick Bentley, did not find fault with Employee trimming limbs as he ascended; rather, he testified Employee "has to be tied-in with a primary tie-in once he gets to where he's at in the tree before he begins any work." He explained the primary tie-in "is a climbing rope, not a safety strap." Bentley explained that "tied-in means that you are tied-in with a climbing rope or safety straps, and before any work is performed, you have to be -- it's mandatory that you're tied-in with a climbing line or a lifeline."

Bentley did not explain what the "100% tie-in" rule is, but he testified "we require our people to be tied-in from the time they leave the ground until the time they return back to the ground safely." When asked why Employer adopted safety guidelines, his response was that anytime you're working aloft there is a possibility that somebody would cut their safety line, "so we address that properly by making it a mandatory requirement that people are tied-in 100 percent of the time, where nobody ever falls out of a tree." Bentley testified that Employee should have had a climbing line and "a safety strap in addition to the climbing line." He agreed that the safety strap is the same thing as the lanyard.

While Employee asserted he was tied-in at all times with his lanyard, he admitted he was not "fully tied-in," and he asserted his failure to do so was due to the foreman rushing him. Although the testimony does not clearly define what the "100% tie-in" policy is, the trial judge found Employer had a 100% tie-in policy and that Employee had actual knowledge of the policy. Our role is not to ascertain the specifics of the policy or to determine the extent of Employee's understanding of the policy; rather, we are to presume that the trial judge's finding that Employee had actual, as opposed to constructive, notice of the rule and the trial judge's conclusion in this regard are correct, unless the preponderance of the evidence is otherwise. Tenn. Code Ann. § 50-5-239(c)(7). We do not find the preponderance of the evidence to be otherwise than found by the trial judge.

**2. Employee's Understanding of the Danger Involved in Violating the Rule**

Employee testified that he knows the rules and that "I always tie-in, because I

know -- you know, I'm scared of falling. I'm not going to hurt myself." He testified that he had never had an accident before and that "I'm not suicidal." The trial judge found that Employee's own testimony evidenced a clear understanding of the danger involved in violating Employer's tie-in policy. The preponderance of the evidence supports that finding.

### 3. Employer's Bona Fide Enforcement of the Rule

Employee offered very little testimony addressing whether Employer's tie-in policies were enforced. When asked about Employer's guidelines and how often, following the completion of his training, the guidelines were brought up by Employer, he responded, "not often." When asked whether he was aware that in the event he was not properly tied-in, he would be terminated, he stated he "was not aware of that." Employee was not asked whether Employer's rules were routinely enforced. There was, however, testimony from Employer's Safety Director to the effect that the Employer's rules were enforced and that Employer had terminated employees for violating lifesaving rules. The Safety Director testified why Employer adopted the safety guidelines and the dangers of trimmers working aloft. He stated, "so we address that properly by making it a mandatory requirement that people are tied-in 100 percent of the time . . . ." He testified "in any situations we've had in the past where anybody violated a lifesaving rule, that employee is terminated." The trial judge found that the uncontroverted proof of Employer that the rule was strictly enforced on a regular basis established "bona fide" enforcement. The evidence does not preponderate against this finding.

### 4. Employee's Lack of a Valid Excuse for Violating the Rule

Employee asserts that the foreman's actions in rushing him to cut limbs as he ascended the tree provide a valid excuse for him not being fully tied-in. Employee testified his foreman was "screaming at me, hollering at me to hurry up, so that's what I was listening to . . . ." He testified there were some limbs in his way going up the tree, "but the foreman was asking me to trim those limbs before I went all the way up." He testified "if [the foreman] wouldn't have rushed me, I could have [done] things differently."

The record does not include any testimony or exhibits that support an assertion that the foreman specifically insisted that the tie-in rule or any other safety rule be violated. In fact, as noted by the trial judge, the implication from the proof is that the foreman could not communicate such a direct instruction due to a language barrier. From a review of the entire record, the only excuse asserted by Employee for failing to abide by the known rule and tie-in before he began cutting limbs would have to be based on the foreman's communications with Employee as he ascended the tree. Even if viewed in the light most favorable to Employee, the communications were limited to the foreman screaming "ándale, ándale, corte rápido." It is not clear from the record how many times

13

the foreman spoke or screamed these words or the order in which the foreman spoke the words, but it is uncontroverted that the foreman screamed or hollered these words as Employee ascended the tree. Employee and his former co-worker testified that if you don't listen to the foreman you could be disciplined by the company. Whether Employee has a valid excuse for violating the known safety rule by not tying-in to his climbing rope before cutting must be analyzed by determining whether the words spoken by the foreman and the manner in which they were spoken provides a "plausible excuse" for Employee's violation. *Mitchell*, 368 S.W.3d at 454.

Employee's Safety Director testified that "telling the employee to hurry up and get up there and cut the tree limb had nothing -- absolutely nothing to do with the safety on that particular job." He explained that the employee still has to climb up the tree and follow the rules and tie-in and perform the work the correct way, "and that simply saying, 'hurry up and get up the tree and start working' doesn't constitute a safety issue to me." When asked whether the Safety Director thought the foreman screaming at Employee had any bearing on the issue, the Safety Director testified as follows:

> I think if he was screaming at him, then [Employee] should have stopped and asked him why he was screaming at him or -- or questioned the situation. Because all employees have the right to stop work. That's on our job briefings. And that's a stop-work authority, any time you're uncomfortable with doing something somebody has asked you to do, every employee has the authority to stop work. And if that was the case, then he should have stopped work and asked the foreman specifically what he wanted him to do and clarify it. It still doesn't justify not tying into the tree and working from it and putting your -- your life in jeopardy.

Even if the foreman was screaming at Employee, the explanation that the foreman was rushing Employee simply does not qualify as a "plausible" explanation. As stated by the trial judge, feeling rushed is simply not a plausible explanation for the noncompliance. The evidence does not preponderate against the trial judge's finding that Employee lacked a valid excuse for not complying with the rule. As in *Mitchell,* Employee's lack of a valid excuse for tying-in before cutting, when the first three elements of Employer's defense have been satisfied, amounts to willfulness. *See Mitchell*, 368 S.W.3d at 455. The trial judge concluded that Employer successfully raised the willful misconduct defense and this conclusion is presumed to be correct as the evidence does not preponderate otherwise. *See* Tenn. Code Ann. § 50-6-239(c)(7).

## Conclusion

For the foregoing reasons, we hold that the evidence does not preponderate against the trial judge's findings that Employer successfully established each of the four elements necessary to carry its burden of proving the defense of willful misconduct or willful failure or refusal to use a safety device. We additionally find that the trial judge's decision does not violate any of the standards identified in Tennessee Code Annotated section 50-6-217(a)(2). Accordingly, the trial judge's decision is affirmed and the case is remanded for any further proceedings that may be necessary.

David F. Hensley, Judge
Workers' Compensation Appeals Board

15