IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
November 9, 2017 Session

## CATHERINE J. HOLLAHAN v. TENNESSEE DEPARTMENT OF HEALTH

**Appeal from the Chancery Court for Davidson County**
**No. 15-1168-IV      Russell T. Perkins, Chancellor**

_____

### No. M2017-00629-COA-R3-CV

_____

An advanced practice nurse worked at three different testosterone clinics in the Memphis area and was charged with violating portions of the Nursing Practice Act and the rules and regulations governing nurses. The Tennessee Board of Nursing (the "Board") held a hearing and determined that the evidence supported many of the alleged offenses. The Board revoked the nurse's certificate to practice as an advanced practice nurse, revoked the nurse's license to practice as a registered nurse in Tennessee and the multistate privilege to practice in any other party state, and assessed civil penalties against her that totaled $7,200. The nurse sought judicial review of the Board's decision, and the trial court affirmed the Board's decision. The nurse then appealed the Board's decision to this court. Concluding that substantial and material facts support the Board's findings, we affirm the Board's decision.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed, as Modified**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which RICHARD H. DINKINS and W. NEAL MCBRAYER, JJ., joined.

William C. Sessions, Memphis, Tennessee, for the appellant, Catherine J. Hollahan.

Herbert H. Slatery, III, Attorney General and Reporter, and Sara Elizabeth Sedgwick, Senior Counsel, Nashville, Tennessee, for the appellee, Tennessee Department of Health.

# OPINION

## I. Factual and Procedural Background

The Board certified Catherine J. Hollahan as a registered nurse in 1993 and as an advanced practice nurse[1] in 2006. Ms. Hollahan worked as an advanced practice nurse in testosterone clinics beginning in 2008. She worked at Ageless Men's Health Testosterone Replacement Clinic ("Ageless") from May 2008 until April 2011, she worked at Body for Life from May 2011 until September 2013, and she was a part owner of and worked at New Life Testosterone Clinic ("New Life") from November 2013 until June 2014. On January 16, 2015, the Board filed a Notice of Hearing and Charges and Memorandum for Assessment of Civil Penalties ("the Notice") against Ms. Hollahan. The charges included practicing without filing a notice and formulary with the Board as required by Tenn. Code Ann. § 63-7-123(b)(1); consuming alcohol and exhibiting impaired behavior during the workday; injecting herself with testosterone without authorization; prescribing medication outside her scope and failing to include these prescriptions in the patients' charts; engaging in a sexual relationship with a patient while employed at Body for Life; fraudulently billing insurance companies for services she did not provide; and providing incompetent care to patients by failing to assess or order lab work before prescribing medications.

The Board held a hearing on August 5, 2016, during which several individuals testified. Following the hearing and the Board members' deliberations, the Board announced its decision and issued a Final Order. The Board made the following Findings of Fact:

> 1. Respondent has been at all times pertinent hereto certified by the Board as an advanced practice nurse in the State of Tennessee, having been granted certificate number 12232 on September 6, 2006, which currently has an expiration date of November 30, 2016. Respondent's advanced practice nurse certificate is active and valid in the State of Tennessee only.
>
> 2. Respondent has been at all times pertinent hereto licensed by the Board as a registered nurse in the State of Tennessee, having been granted license number 96704 on September 22, 1993, which currently has an expiration date of November 30, 2016. Respondent's registered nurse license is active and bears a multistate privilege to practice nursing in states which have entered into the Interstate Nurse Licensure Compact.

---

[1]Tennessee Code Annotated section 63-7-126 defines an "advanced practice registered nurse" as "a registered nurse with a master's degree or higher in a nursing specialty and national specialty certification as a nurse practitioner, nurse anesthetist, nurse midwife or clinical nurse specialist."

3. Between May 2008 and April 2011, Respondent was employed as a nurse practitioner at Ageless Men's Health Testosterone Replacement Clinic ("Ageless Men's Health") in Shelby County, Tennessee. Respondent was observed consuming alcohol inside Ageless Men's Health while treating patients on numerous occasions and exhibiting impaired behavior.

4. Respondent, between May 2011 and September 2013, was employed as a nurse practitioner by Body for Life, a men's health clinic in Bartlett, Tennessee. During her tenure at Body for Life, Respondent was observed exhibiting impaired behavior while at work and smelling of alcohol.

5. In 2012, patient W.A. came to Body for Life and was treated by Respondent. Respondent diagnosed W.A. with depression and prescribed her Xanax, Ambien, and antidepressants, which was outside Respondent's scope of employment. Respondent did not chart the visit or complete an assessment of the patient.

6. Respondent was observed injecting herself with testosterone belonging to Body for Life without authorization.

7. Respondent engaged in a sexual relationship with patient J.R. while employed at Body for Life.

8. Between November 2013 and June 3, 2014, Respondent worked as a nurse practitioner and was part owner of New Life Testosterone Clinic ("New Life") in Arlington, Tennessee. During her tenure there, Respondent would frequently leave for lunch and retire to her truck with instructions to page her if a patient arrived to be treated.

9. Respondent was frequently observed exhibiting impaired behavior and smelling of alcohol while treating patients at New Life.

10. Frequently, Respondent would tell the medical assistant what to prescribe the patient even though Respondent never assessed or treated the patient.

11. Respondent did not provide competent care to several patients while practicing as an advanced practice nurse at New Life including failure to assess patients, failure to order lab work, and treating patients without a formulary.

12. Respondent has never once filed a notice and formulary with the Tennessee Board of Nursing pertaining to any of her employment as an advanced practice nurse.

The Board then made the following Conclusions of Law:[2]

The Board, having jurisdiction over this matter, finds the facts in this Order are sufficient to establish that the Respondent has violated the following provisions of Tenn. Code Ann. § 63-7-101, *et seq*., and the Official Compilation Rules and Regulations of the State of Tennessee for the Board of Nursing (Tenn. Comp. R. & Regs.) 1000-1-.01, *et seq*.

13. The facts enumerated in paragraphs three (3), four (4), and nine (9) constitute a violation of Tenn. Code Ann. § 63-7-115(a)(1):

> (C) Is unfit or incompetent by reason of negligence, habits or other cause.
> (F) Is guilty of unprofessional conduct.

14. The facts enumerated in paragraphs three (3), four (4), and [nine (9)] constitute a violation of Tenn. Comp. R. & Regs. 1000-1-.13(1), which defines "unprofessional conduct, unfitness or incompetency by reason of negligence, habits or other cause" as including, but not limited to:

> (f) The use of any intoxicating beverage or the illegal use of any narcotic or dangerous drug while on duty in any health care facility, school, institution, or other work place location;
> (g) Being under the influence of alcoholic beverages, or under the influence of drugs which impair judgment while on duty in any health care facility, school, institution or other work place location.

15. The facts enumerated in paragraphs five (5) and [seven (7)] constitute a violation of Tenn. Code Ann. § 63-7-115(a)(1):

> (C) Is unfit or incompetent by reason of negligence, habits or other cause.
> (F) Is guilty of unprofessional conduct.

---

[2]In the Conclusions of Law section of its Final Order, the Board mistakenly referenced paragraph numbers from the State's proposed order, which differed from those in the Findings of Fact section of the Final Order. To avoid confusion and maintain consistency, we will cite to the correct paragraph numbers throughout this opinion, and we will place the corrected numbers within brackets.

16. The facts enumerated in paragraphs [five (5), seven (7), eight (8), ten (10), and eleven (11)] constitute a violation of Tenn. [Comp.] R. & Regs. 1000-1-.13(1), which defines "unprofessional conduct, unfitness or incompetency by reason of negligence, habits or other cause" as including, but not limited to:

> (b) Failure to maintain a record for each patient which accurately reflects the nursing problems and interventions for the patient and/or failure to maintain a record for each patient which accurately reflects the name and title of the nurse providing care;
> (t) Over-prescribing, or prescribing in a manner inconsistent with Rules 1000-04-.08 and 1000-04-.09;
> (u) Practicing professional nursing in a manner inconsistent with T.C.A. § 63-7-103.[3]

---

[3]Tennessee Code Annotated section 63-7-103 provides:

> (a)(1) "Practice of professional nursing" means the performance for compensation of any act requiring substantial specialized judgment and skill based on knowledge of the natural, behavioral and nursing sciences and the humanities as the basis for application of the nursing process in wellness and illness care.
> (2) "Professional nursing" includes:
> (A) Responsible supervision of a patient requiring skill and observation of symptoms and reactions and accurate recording of the facts;
> (B) Promotion, restoration and maintenance of health or prevention of illness of others;
> (C) Counseling, managing, supervising and teaching of others;
> (D) Administration of medications and treatments as prescribed by a licensed physician, dentist, podiatrist, or nurse authorized to prescribe pursuant to § 63-7-123, or selected, ordered, or administered by an advanced practice registered nurse specializing as a certified registered nurse anesthetist (CRNA) during services ordered by a physician, dentist, or podiatrist and provided by a CRNA in collaboration with the ordering physician, dentist, or podiatrist that are within the scope of practice of the CRNA and authorized by clinical privileges granted by the medical staff of the facility. A CRNA shall collaborate in a cooperative working relationship with the ordering physician, dentist, or podiatrist in the provision of patient care, which includes consultation regarding patient treatment and cooperation in the management and delivery of health care;
> (E) Application of such nursing procedures as involve understanding of cause and effect; and
> (F) Nursing management of illness, injury or infirmity including identification of patient problems.
> (b) Notwithstanding the provisions of subsection (a), the practice of professional nursing does not include acts of medical diagnosis or the development of a medical plan of care and therapeutics for a patient, except to the extent such acts may be authorized by §§ 63-1-132, 63-7-123 and 63-7-207.

(w) Engaging in acts of dishonesty which relate to the practice of nursing.

17. The facts enumerated in paragraph[] [six (6)] constitute a violation of Tenn. Comp. R. & Regs. 1000-1-.13(1), which defines "unprofessional conduct, unfitness or incompetency by reason of negligence, habits or other cause" as including, but not limited to:

(e) Unauthorized use or removal of narcotics, drugs, supplies, or equipment from any health care facility, school, institution or other work place location.
(w) Engaging in acts of dishonesty which relate to the practice of nursing.

18. Respondent's acts and conduct enumerated in paragraph [twelve (12)] constitute violations of Tenn. Code Ann. § 63-7-115(a)(1):

(G) Has violated or attempted to violate, directly or indirectly, or assisted in or abetted the violation of, or conspired to violate, any provision of this chapter or any lawful order of the board issued pursuant thereto.

19. The facts stipulated in paragraph [twelve (12)] constitute a violation of Tenn. Code Ann. § 63-7-123(b)(1):

A nurse who has been issued a certificate of fitness as a nurse practitioner pursuant to § 63-7-207 and this section shall file a notice with the board, containing the name of the nurse practitioner, the name of the licensed physician having supervision, control and responsibility for prescriptive services rendered by the nurse practitioner and a copy of the formulary describing the categories of legend drugs to be prescribed and/or issued by the nurse practitioner. The nurse practitioner shall be responsible for updating this information.

The Board then ordered that Ms. Hollahan's certificate to practice as an advanced practice nurse and her license to practice as a registered nurse in Tennessee, as well as the multistate privilege to practice in any other party state, "shall be and are hereby revoked." The Board assessed penalties against Ms. Hollahan that totaled $7,200. The penalties included the following: three Type A civil penalties in the amount of $1,000 each, with each penalty representing the three testosterone facilities where Ms. Hollahan worked; six Type C civil penalties in the amount of $200 each for the first six months of employment in 2008 when Ms. Hollahan had no notice or formulary on file as legally required; and

thirty additional Type C civil penalties in the amount of $100 each for the thirty subsequent months when Ms. Hollahan had no notice or formulary on file. Finally, the Board assessed the costs of the hearing against Ms. Hollahan in an amount not to exceed $20,000, which was payable within twenty-four months from the date when the Assessment of Costs was issued.

Ms. Hollahan appealed the Board's Final Order to the chancery court, which affirmed the Board's decision and choice of sanctions.[4] Ms. Hollahan then appealed the Board's decision to this court. Ms. Hollahan argues that the Board erred by (1) adding a charge during its deliberations without providing notice to Ms. Hollahan or providing her with an opportunity to prepare a defense to the new charge and (2) reaching conclusions of law that were not supported by substantial and material evidence.

## II. ANALYSIS

### A. Standard of Review

Judicial review of agency decisions is authorized by the Uniform Administrative Procedures Act, Tenn. Code Ann. §§ 4-5-101–502 (the "UAPA"). Under the UAPA, a reviewing court does not sit as a trial court and does not consider the record de novo. *See Wayne Cnty. v. Tenn. Solid Waste Disposal Control Bd.*, 756 S.W.2d 274, 279 (Tenn. Ct. App. 1988). The court's review is limited to the administrative record, Tenn. Code Ann. § 4-5-322(g), and the court defers to the findings by the administrative agency acting within its area of expertise, *StarLink Logistics Inc. v. ACC, LLC*, 494 S.W.3d 659, 668-69 (Tenn. 2016); *Wayne Cnty.*, 756 S.W.2d at 279. As our Supreme Court has explained, reviewing courts "do not second-guess the agency as to the weight of the evidence . . . even if the evidence could support a different result." *StarLink Logistics*, 494 S.W.3d at 669 (citations omitted).

The UAPA permits the reviewing court to reverse or modify the administrative decision if the petitioner's rights have been prejudiced because the decision, findings, inferences, or conclusions are:

(1) In violation of constitutional or statutory provisions;

(2) In excess of the statutory authority of the agency;

(3) Made upon unlawful procedure;

---

[4]The chancery court modified the Board's finding in paragraph 7 to find that Ms. Hollahan engaged in "an inappropriate romantic relationship" rather than "an inappropriate sexual relationship" with a patient while employed at Body for Life.

(4) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or

(5)(A) Unsupported by evidence that is both substantial and material in the light of the entire record.

Tenn. Code Ann. § 4-5-322(h). The *StarLink Logistics* Court addressed the "arbitrary or capricious" language of the statute thusly:

A decision is arbitrary or capricious if it "is not based on any course of reasoning or exercise of judgment, or . . . disregards the facts or circumstances of the case without some basis that would lead a reasonable person to reach the same conclusion." "If there is room for two opinions, a decision is not arbitrary or capricious if it is made honestly and upon due consideration, even though [a reviewing court] think[s] a different conclusion might have been reached." The "arbitrary or capricious" standard is a limited scope of review, and a court will not overturn a decision of an agency acting within its area of expertise and within the exercise of its judgment solely because the court disagrees with an agency's ultimate conclusion.

*Starlink Logistics*, 494 S.W.3d at 669-70 (citations omitted).

The UAPA provides that "[i]n determining the substantiality of evidence, the court shall take into account whatever in the record fairly detracts from its weight, but the court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact." Tenn. Code Ann. § 4-5-322(h)(5)(B). The statute does not explain what evidence should be considered "substantial and material," but the courts have determined that this standard is "less than a preponderance of the evidence" but "more than a 'scintilla or glimmer.'" *StarLink Logistics*, 494 S.W.3d at 669 (citing *Wayne Cnty.*, 756 S.W.2d at 280); *see also Pace v. Garbage Disposal Dist.*, 390 S.W.2d 461, 463 (Tenn. Ct. App. 1965). Substantial and material evidence has been described as "'such relevant evidence as a reasonable mind might accept to support a rational conclusion and such as to furnish a reasonably sound basis for the action under consideration.'" *Clay Cnty. Manor, Inc. v. State Dep't of Health & Env't*, 849 S.W.2d 755, 759 (Tenn. 1993) (quoting *S. Ry. Co. v. State Bd. of Equalization*, 682 S.W.2d 196, 199 (Tenn.1984)). "No agency decision pursuant to a hearing in a contested case shall be reversed, remanded or modified by the reviewing court unless for errors that affect the merits of such decision." Tenn. Code Ann. § 4-5-322(i).

B. Removal and Self-Injection of Testosterone

In its Notice, the Board charged Ms. Hollahan with removing testosterone from Body for Life without authorization and injecting herself with it. The Board asserted this conduct violated Tenn. Comp. R. & Regs. 1000-01-.13(1), which states:

(1) Unprofessional conduct, unfitness, or incompetency by reasons of negligence, habits or other causes, as those terms are used in the statute, is defined as, but not limited to, the following:

. . . .

(e) Unauthorized use or removal of narcotics, drugs, supplies, or equipment from any health care facility, school, institution or other work place location;

. . . .

(w) Engaging in acts of dishonesty which relate to the practice of nursing.

During the hearing, the Board questioned Samantha Nix about Ms. Hollahan's use of testosterone at Body for Life. Ms. Nix was a medical assistant and office manager at Body for Life during a portion of the time when Ms. Hollahan worked there.

Q: Did you ever observe Ms. Hollahan using any medical products or medications while at Body for Life?

A: Yes, I did.

Q: Can you tell us about those incidents?

A: She used testosterone; she self-injected herself.

Q: Did you personally witness her injecting herself?

A: Yes, I did.

Ms. Hollahan admitted injecting herself with testosterone. She testified that one of the owners of Body for Life, Steve Tormina, authorized her to use testosterone and that no other owner ever withdrew that authorization.[5] Ms. Hollahan then testified that the other owner, Anthony Terhune, knew she was taking testosterone and that he never told her to

_____

[5]Mr. Tormina did not testify at the hearing or offer evidence by way of affidavit or declaration.

stop taking it. However, Mr. Terhune provided an affidavit dated July 21, 2015, contradicting Ms. Hollahan's testimony. Mr. Terhune swore under oath as follows:

> 3. I did not give permission, verbal or otherwise, for Catherine Hollahan to take testosterone or any other medical product belonging to the clinic for her own personal use.
>
> 4. I did not give permission, verbal or otherwise, to Catherine Hollahan to inject herself with testosterone belonging to the clinic for any purpose.
>
> 5. I have no recollection of a conversation related to her need for testosterone due to low energy or for any other purpose.

During their deliberations, the Board members discussed, *inter alia*, whether Ms. Hollahan had a prescription for testosterone and agreed that a prescription was necessary for anyone taking testosterone.

> Mr. Earwood: [Testosterone] is a medicine that requires a prescription. You can't self-prescribe testosterone, and we never heard that she actually had a prescription to self - -
>
> Ms. Cecil: That's correct. We did not.
>
> . . . .
>
> Mr. Earwood: . . . [W]e do agree that she injected herself without a prescription.
>
> . . . .
>
> Ms. Cecil: So Number [9] we would amend to say that we agree that the respondent was injecting herself with testosterone without a prescription.

Ms. Hollahan is correct in stating that she was not formally charged with taking testosterone without a prescription and that no evidence was submitted regarding whether she had a prescription for testosterone. However, regardless of the Board members' discussion of the need for a prescription, the Board's Final Order does not reflect this aspect of their deliberations and does not mention anything about a prescription. Instead, the Board made the finding of fact in paragraph six that Ms. Hollahan "was observed injecting herself with testosterone belonging to Body for Life without authorization." In its Conclusions of Law, the Board held in paragraph seventeen that the findings set forth in paragraph six constituted a violation of Tenn. Comp. R. & Regs. 1000-1-.13(1)(e) and (w), set forth above.

The Board's Final Order is the operative document to consider in determining whether Ms. Hollahan was sanctioned for engaging in conduct that was not included in the Notice, not the Board members' discussion during their deliberations. As the Court of Appeals has explained,

> [W]hat is of greatest importance is the order of the Board. The appellant must carry a heavy burden to show that the Board's findings were arbitrarily made. It would be difficult to carry that burden by merely pointing out that statements made by the agency members during deliberations failed to address all of the essential points in the case. We hold that the statements made by the individual members during their deliberations do not show, as a matter of law, that their decision was arbitrary and capricious.

*Sierra Club v. Tenn. Dep't of Health & Env't*, No. 01-A-01-9203CH00131, 1992 WL 288870, at *2 (Tenn. Ct. App. Oct. 16, 1992).

"Courts customarily defer to adjudicatory determinations made by administrative agencies acting within their area of specialized knowledge, experience, and expertise." *Martin v. Sizemore*, 78 S.W.3d 249, 269 (Tenn. Ct. App. 2001). As a result, "courts do not substitute their own judgment for that of a board or agency with regard to the weight of the evidence." *Id.* As the *StarLink Logistics* Court has written, we are not to second-guess the agency's decision with regard to the weight of the evidence, even when the evidence could support a different result. *StarLink Logisitics*, 494 S.W.3d at 669. Despite Ms. Hollahan's testimony that the owners of Body for Life were aware of her testosterone use and authorized her to use the testosterone belonging to Body for Life, Mr. Terhune's affidavit contradicts this testimony. We hold that the Board's finding of fact set forth in paragraph six was supported by substantial and material evidence, and we, therefore, affirm the Board's conclusion of law as set forth in paragraph seventeen of the Final Order.

C. Remaining Allegations

Ms. Hollahan asserts that the remaining charges against her were not supported by substantial and material evidence and should be reversed on appeal. We will address the remaining allegations one by one to determine whether substantial and material evidence exists in the record to support the Board's findings of fact and conclusions of law.

- 11 -

### 1. Notice and Formulary

The Board found in paragraph twelve of its Final Order that Ms. Hollahan never filed a notice and formulary[6] pertaining to any of her jobs working as an advanced practice nurse, and it concluded in paragraph 18 that this constituted a violation of Tenn. Code Ann. § 63-7-115(a)(1), quoted above. Filing a formulary is required by Tenn. Code Ann. § 63-7-123(b)(1), which states:

> A nurse who has been issued a certificate of fitness as a nurse practitioner pursuant to § 63-7-207 and this section shall file a notice with the board, containing the name of the nurse practitioner, the name of the licensed physician collaborating with the nurse practitioner who has control and responsibility for prescriptive services rendered by the nurse practitioner, and a copy of the formulary describing the categories of legend drugs to be prescribed and/or issued by the nurse practitioner. The nurse practitioner shall be responsible for updating this information.

Ms. Hollahan does not dispute that she has never filed a formulary with the Board, and she signed a stipulation to this effect. Ms. Hollahan does not challenge this finding or conclusion of law on appeal.

### 2. Alcohol Usage

The Board found in paragraph three of its Final Order that Ms. Hollahan was observed consuming alcohol at Ageless while treating patients and that she exhibited impaired behavior. In paragraph four the Board found that Ms. Hollahan was observed exhibiting impaired behavior at Body for Life and smelling of alcohol. In paragraph nine the Board found that Ms. Hollahan was observed on frequent occasions exhibiting impaired behavior and smelling of alcohol while treating patients at New Life.

Mike Harrison was the vice president of administration for Ageless starting in 2010, and he testified that Ms. Hollahan "had been consuming alcoholic beverages while on the job, and that was against our policy." Mr. Harrison testified that when he confronted her in April 2011, Ms. Hollahan admitted to this. Mr. Harrison was asked at the hearing whether he was "absolutely sure that she admitted that she had been consuming alcohol," and he responded: "Yes, I am." Mr. Harrison then explained that he terminated Ms. Hollahan's employment at Ageless at that point.

Robbie Harker worked as the front office coordinator/receptionist at Ageless while Ms. Hollahan worked there, and Ms. Harker testified that Ms. Hollahan had "alcohol in

---

[6]"Formulary" is defined as "[a]n official list giving details of prescribable medicines." https://en.oxforddictionaries.com/definition/formulary.

her possession while she was on duty as a nurse." Ms. Harker testified that Ms. Hollahan kept it in a cup with a lid and a straw and that she had it with her every day.

Ms. Nix testified as follows about Ms. Hollahan's alcohol consumption at Body for Life:

Q: Did you ever have concerns that Ms. Hollahan was consuming alcohol while on duty as a nurse?

A: I did.

Q: What made you have those concerns?

A: She would make jokes about not having enough wine with her Cheerios or needing to refill her sippy cup.

Q: What is - - When you say "sippy cup," what do you mean by that?

A: She would have a water bottle with her almost every day, and she would go outside and come back in and it would be refilled.

Q: Was this a transparent water bottle? Could you see through it?

A: It was like one of those cheap, clear, "the banks normally give you for free" water bottles. Yes, you can see right through it.

Q: What color was the liquid inside the bottle?

A: Red or dark maroon.

. . . .

Q: Did you ever personally observe Ms. Hollahan smelling of alcohol while she was on duty?

A: I did. . . .

Q: About how often would you say that you personally observed her smelling of alcohol?

A: Several times during the workweek.

Q: Did you ever observe any other kind of what you would classify as impaired behavior?

A: She would get loud and obnoxious.

. . . .

Q: Did you ever see any other behavior that led you to believe that she might be impaired or consuming alcohol while on duty as a nurse?

A: Yes.

Q: What was that?

A: She would get loud. She would get very obnoxious, even to patients. She would make inappropriate jokes, just out of the normal behavior.

. . . .

Q: Did you ever see her - - aside from the bottle you mentioned, did you ever see her consuming alcohol inside the premises?

A: Yes.

Q: And when was that?

A: When she would go outside and refill her water bottle and come back in and go to her desk.

Tiffany Wright was a medical assistant at the time of the hearing, and she worked with Ms. Hollahan at both Body for Life and New Life. Ms. Wright testified about Ms. Hollahan's alcohol use as follows:

Q: While at Body for Life, did you ever suspect that Ms. Hollahan may have been engaging in any poor behavior for a nurse while she was on duty?

A: Yes.

Q: What did you think might be happening?

A: Drinking.

- 14 -

Q: What made you think Ms. Hollahan may have been consuming alcohol?

A: The smell sometimes was just overwhelming and then a red face and also [she] had cough drops.

. . . .

Q: Did you ever observe her with any slurred speech or other behavior that made you concerned she might be consuming alcohol while on duty?

A: On just rare occasions, there were a couple of incidents of slurred speech.

. . . .

A: I saw her drinking out of a styrofoam cup.

. . . .

Q: . . . [Y]ou are telling me that this happened every day?

A: Hm-hmm.

. . . .

Q: She came in intoxicated every day?

A: Yes.

Q: She came in drinking every day?

A: Yes.

Ms. Wright further testified that she "observe[d] the same type of behavior . . . at New Life that [she] did at Body for Life" with regard to Ms. Hollahan's alcohol consumption.

Ms. Harker also worked with Ms. Hollahan at New Life after she left Ageless. She testified that she did not observe Ms. Hollahan with alcohol in her possession at New Life, but she did smell alcohol on Ms. Hollahan in the office and she heard Ms. Hollahan talk with slurred speech. Ms. Harker explained:

There were times when she would be there and I could smell alcohol. . . . [T]here would have been a couple of times where there was some slurred

- 15 -

speech, where I could tell it was not a normal speech pattern of hers. It was a little bit different. It was a slurred speech pattern. Just from knowing her and talking to her every day, one thing is a normal sound and the other thing is not.

Ms. Hollahan denied drinking while she was working at any of the testosterone clinics. She admitted drinking one time at Body for Life, but she testified that this was after hours and took place around the holidays. Ms. Hollahan testified that she used throat lozenges to control coughing that was caused by one of her medications and that she was a heavy smoker and used mouth wash to cover up her smoker's breath. She claimed that the other witnesses mistook the smell of the lozenges for alcohol.

Timothy Long, who was an owner of New Life, created a note for Ms. Hollahan's personnel file documenting that on April 11, 2014, he, Ms. Wright, and Ms. Harker noticed that Ms. Hollahan had been drinking. The note stated that they "could clearly smell alcohol on her breath along with a flushed face and erratic behavior." Ms. Hollahan introduced evidence indicating that she did not work on April 11, 2014, and she argues that this note was falsified.[7] According to Ms. Hollahan, this contradictory evidence proves that a reasonable mind could not have concluded that she consumed alcohol while working at New Life.

Ms. Hollahan is asking this court to reweigh the evidence presented at the hearing, which we are not authorized to do. *See MobileComm of Tenn., Inc. v. Tenn. Pub. Serv. Comm'n*, 876 S.W.2d 101, 104 (Tenn. Ct. App. 1993) ("This court may not substitute its judgment for that of the agency in reviewing the evidence."). Although evidence was presented that Ms. Hollahan was consuming alcohol at New Life on a day when she may not, in fact, have been working at New Life, other evidence was presented that she was observed on other occasions at New Life smelling of alcohol and acting in an impaired manner. Further, evidence was introduced that Ms. Hollahan consumed alcohol while working at Ageless and Body for Life. "'The judicial function is exhausted when there is found to be a rational basis for the conclusions approved by the administrative body.'" *Blue Ridge Transp. Co. v. Pentecost*, 343 S.W.2d 903, 906 (Tenn. 1961) (quoting *Miss. Valley Barge Line Co. v. United States*, 292 U.S. 282, 286-87 (1934)). We conclude that

---

[7]When one of the Board members pointed out to Ms. Wright that other evidence showed Ms. Hollahan did not work on April 11, 2014, Ms. Wright indicated that it was possible the date on the statement was incorrect. Ms. Wright told the Board members that she was certain the events described in the note did, in fact, happen, and that "this type of behavior" happened more than once. When the Board members told Ms. Harker that other evidence showed Ms. Hollahan did not work on April 11, 2014, Ms. Harker responded:

> I can just tell you personally that that day was one of the days that I knew something was different in the speech. I knew that there was a difference in odor. My father drank and smoked, and I know the smell. I know the odor that I was made aware of that day in her presence. And I would not have written that, signed that, if that was not the truth.

the record contains substantial and material evidence to support the Board's findings of fact set forth in paragraphs three, four, and nine. Accordingly, we affirm the Board's conclusions of law set forth in paragraphs thirteen and fourteen of its Final Order in which the Board concluded that Ms. Hollahan's conduct violated Tenn. Code Ann. § 63-7-115(a)(1)(C) and (F) as well as Tenn. Comp. R. & Regs. 1000-1-.13(1)(f) and (g), the provisions of which are set forth above.

### 3a. Relationship with Patient J.R.

In paragraph seven of its Final Order, the Board found that Ms. Hollahan "engaged in a sexual relationship with patient J.R. while employed at Body for Life." The evidence introduced in support of this finding included testimony from Ms. Nix as well as text messages from Ms. Hollahan to J.R. that Ms. Hollahan confirmed were hers. Ms. Nix testified as follows:

Q: To your knowledge, did Ms. Hollahan ever engage in a personal relationship with any patients? . . .

A: Yes.

Q: And using initials, can you tell us the name of that patient?

A: J.R.

Q: How do you have personal knowledge of this relationship?

A: Ms. Hollahan told me.

Q: Can you please describe those conversations?

A: When J.R. would come into the clinic, no one was allowed to see him. She would say . . . stuff like, "Send my f**k buddy back," and they would be back there for long periods of time in the clinic.

Q: Was that a one-time thing, or where there other examples of these types of statements?

A: She was very open about who J.R. was. She would read off their conversations to me. Some were very vulgar, talking about oral sex with each other and things like that.

The following portion of Ms. Hollahan's text conversation with J.R. dated Friday,

April 25, 2014, and taking place between 10:46 and 11:21 p.m., was introduced as an exhibit:

J.R.: Just haven't been hearing from you much..

C.H.: I know :( But I'm back now. :-) :-)

J.R. You sure!?

C.H.: Oh yes!!

J.R.: When and how will you show me

C.H.: That im not sure of but ill make it good :-) :-)

J.R.: Uh huh, you don't even miss me

C.H.: Shut up and go to bed. I think you know better.

J.R.: Babe

C.H.: Lol, well. Baby im so sleepy I have to go to bed. I love you and miss you. PROMISE!!

Ms. Hollahan denied that she was sexually involved with J.R. She testified about the text messages as follows:

Q: Do you call other patients baby?

A: Yes.

Q: And you say I love you to other patients?

A: I have.

Q: Do you feel like that's an appropriate relationship between a provider and a patient?

A: We developed a relationship between provider and patient that developed to that degree.

Q: And what degree is that?

- 18 -

A: A strong friendship.

. . . .

Q: And you don't remember what you were going to make good for him with smiley faces?

A: No, I do not.

### 3b. Prescription of Xanax and Ambien

In paragraph five, the Board found that while she was working at Body for Life, Ms. Hollahan diagnosed patient W.A. with depression and prescribed Ambien and Xanax for her, which drugs were outside the scope of Ms. Hollahan's employment. The Board also found that Ms. Hollahan failed to complete an assessment of W.A. or chart W.A.'s visit.

Eddie Michael Diaz was a part owner of Body for Life when Ms. Hollahan worked there. Mr. Diaz was asked at the hearing about the types of prescriptions the clinic's providers were permitted to prescribe for patients. Mr. Diaz responded that the protocols approved by the physician in the office included testosterone, phentermine, sinus cocktails, B12 shots, and lipotropic shots. Mr. Diaz testified that when he spoke with Ms. Hollahan about limiting her prescriptions to these drugs, Ms. Hollahan told him to mind his own business and not tell her how to treat patients.

W.A. testified that Ms. Hollahan failed to perform a medical assessment or physical exam prior to prescribing Xanax, Lexapro, and Ambien for her. According to W.A., Ms. Hollahan failed to do any blood work on her, asked for no contact information of her previous doctor for the purpose of obtaining medical records, and failed to discuss any possible dangerous interaction between the drugs before giving her a prescription for these three medications. W.A. testified that she was not taking these drugs prior to coming in to see Ms. Hollahan at Body for Life and that Ms. Hollahan refilled her prescriptions for "about two years" even though W.A. did not return to the clinic for another face-to-face visit with Ms. Hollahan.

Ms. Hollahan admitted prescribing Xanax, Lexapro, and Ambien for W.A., and she testified that Henry Stamps, who was the medical director at Body for Life at that time, authorized her to prescribe these drugs for W.A. She explained that the Lexapro and Xanax were to treat W.A.'s depression and the Ambien was to help her sleep. Ms. Hollahan also testified that she created a chart for W.A. Ms. Hollahan's testimony contradicted that of Ms. Nix, who testified that she could not find a chart for W.A. when she was looking for it to assist Ms. Hollahan in refilling W.A.'s prescriptions.

Based on the evidence introduced at the hearing, the Board concluded that Ms. Hollahan's relationship with J.R. and her prescription of Xanax, Lexapro, and Ambien to W.A. constituted violations of Tenn. Code Ann. § 63-7-115(a)(1)(C) and (F) as well as Tenn. Comp. R. & Regs. 1000-1-.13(1)(b), (t), (u), and (w), set forth above. We conclude that substantial and material evidence was introduced at the hearing to support the Board's findings of fact with respect to both paragraphs five and seven and affirm the Board's conclusions of law set forth in paragraphs fifteen and sixteen.[8]

### 4. Incompetent Care of Patients

In paragraph ten the Board found that Ms. Hollahan would frequently tell her medical assistant what to prescribe for a patient when Ms. Hollahan failed to assess or treat the patient first. In paragraph eleven, the Board found that Ms. Hollahan failed to provide competent care to several patients at New Life by failing to assess the patients or order lab work and treating the patients without a formulary.

The evidence supporting the Board's findings included testimony from Ms. Harker, Ms. Nix, Ms. Wright, Mr. Long, and an expert witness. Ms. Harker testified that when she worked at New Life, she often noticed that Ms. Hollahan would mark a patient's encounter form, which was used for billing purposes, that she had seen the patient when, in reality, she had not.

Q: Do you have personal knowledge of Ms. Hollahan filling out encounter forms indicating that she had seen a patient when you knew she, in fact, had not?

A: Yes.

Q: How many times did you see that?

A: I don't know a count of times, but it was a lot. Several.

Ms. Nix testified that if a new patient came in to Body for Life while Ms. Hollahan was not in the office, Ms. Hollahan instructed Ms. Nix to call her on her cell phone and Ms. Hollahan would tell Ms. Nix how to treat the patient.

Q: So what would happen if a patient showed up to be treated during the day when Ms. Hollahan wasn't there? Was there another provider?

---

[8]Although the trial court modified the Board's finding to conclude that Ms. Hollahan engaged in "an inappropriate romantic relationship" rather than "an inappropriate sexual relationship," we find the record supports the Board's finding that Ms. Hollahan was engaged in an inappropriate sexual relationship with a patient while working at Body for Life.

A:  There was not.

Q:  So take me through what you do with a patient who shows up to be treated when there is no provider present.
A:  If they are an existing patient, I would just normally give them their injection and send them on their way.  If they were a new patient, I was supposed to call [Ms. Hollahan].

Q:  And did she tell you to do that?

A:  Yes.

Q:  Did she ever, when she returned to the office, review the charts of those patients on whom [sic] you had treated?

A:  Not to my knowledge.

Ms. Wright gave similar testimony.  She testified as follows:

Q:  What specific instructions did she give you for the patient if they showed up while she was away?

A:  We just did our normal duties.  We drew blood, went over the - - like, we told them what we did in the clinic and what went on when you started getting injections.  And we had - - we had a certain protocol, that, you know, she wanted us to give 200 milligrams.  And if I have [sic] any questions, I would call her on her cell phone.

Q:  And this is for new patients as well as returning patients?

A:  Yes.

Q:  After a new patient would come in and you would run through this with them and you would contact Ms. Hollahan if you had any questions, was there a system in place where Ms. Hollahan would then review any charts that you had worked on while you were seeing these patients without her?

A:  She was supposed to, but I don't know . . . what she did.

Ms. Wright testified that Ms. Hollahan prescribed testosterone to at least one patient at New Life before knowing the patient's testosterone level.  Ms. Wright signed a statement that read:

- 21 -

On 4/5/14 the patient was given a prescription for testosterone before receiving his testosterone level. When the levels came back, the level was 910. No documentation in the chart as to prescription being given and no notes in Kareo.[9] We do not know if he had been on previous treatments to make his level that high.

In response to further questioning, Ms. Wright testified that the patient's chart did not reflect that he had been given a prescription for testosterone on April 5, 2014, although Ms. Wright knew this to be the case.

Mr. Long testified that at one point while Ms. Hollahan was working at New Life, he became concerned about the clinic's charts. Mr. Long testified as follows:

Q: Mr. Long, after your review of the records, what did you yourself notice in the charts that gave you concern?

A: There was nothing in the charts. There were no vitals, no sub notes, no provider notes, no assessment of the patient. There was nothing in there.

Q: Did you ever - - in the course of your being there and owning the clinic, did you ever discover there were patients who Ms. Hollahan treated but for whom there was no chart that could be found?

A: Yeah. There were many times where we could not find the patient's chart.

At the time of the hearing, Jacob Page was an acute care nurse practitioner who acquired his advanced practice nursing certificate in 2007, and the Administrative Law Judge accepted the State's proffer of him as an expert witness. Prior to the hearing, Mr. Page reviewed Ms. Hollahan's patient records that Mr. Long had produced in response to the State's request for documents. Mr. Page testified that the records he reviewed revealed numerous deficiencies in Ms. Hollahan's patient care, including the failure to perform baseline lab work or take a patent's vital signs before prescribing testosterone and prescribing testosterone when lab results showed a patient's testosterone level was already elevated. Mr. Page testified about the harmful physiological effects patients may suffer when they have too much testosterone. According to Mr. Page, a patient should have baseline lab tests followed by additional tests every three to six months throughout the time an individual is a patient at a testosterone clinic, which was not the standard of care Ms. Hollahan was providing. The following is an excerpt from Mr. Page's testimony:

---

[9]Kareo was an electronic medical records system.

Q: Are you familiar with the term "cycling"?

A: Yes.
Q: Can you tell us what that means?

A: Cycling is giving a large amount of testosterone for a certain period of time - - maybe 12 weeks, maybe 16 weeks - - and stacking it at high doses weekly and giving medication such as tamoxifen and Arimidex to help stop that conversion of testosterone to estrogen and to give it more of a pure testosterone.

Q: Is this, in your opinion, an unhealthy practice?

A: Yes.

Q: Did you find evidence of that in the charts that you reviewed?

A: I believe I did.

Q: Mr. Page, across the board with these charts that you reviewed, the ones in evidence, to you, do they represent a practice that is below the standard of care for practitioners who practice administering testosterone to patients?

A: Yes.

Ms. Hollahan testified that the records Mr. Long produced to the State were incomplete and that the completed records would include the charts and notes she made for the patients the State alleged were nonexistent. Ms. Hollahan was asked about some of the patients whose records Mr. Page reviewed and testified did not receive the appropriate standard of care. She testified that these particular patients had followed her to New Life from Body for Life and that lab work had been performed on these individuals at Body for Life recently enough that additional lab work was not yet necessary. Ms. Hollahan testified that no nationwide policy existed indicating how often a patient who was receiving testosterone should have his or her testosterone level checked. She also testified that no doctor ever told her that she overprescribed, prescribed something she should not have, or that she did not have authority to prescribe the medications she did prescribe.

The Board determined that the evidence submitted at the hearing supported the legal conclusion set forth in paragraph sixteen of the Board's Final Order, which was that Ms. Hollahan violated Tenn. Comp. R. & Regs. 1000-1-.13(1)(b), (t), (u), and (w), quoted above. Our review of the record leads us to conclude that substantial and material

evidence was introduced at the hearing to support the Board's findings of fact set forth in paragraphs ten and eleven and that that these facts support the Board's conclusion that Ms. Hollahan's conduct constituted violations of these provisions of the rules and regulations applicable to nurses.

    D.  Sanctions

Ms. Hollahan does not address each sanction imposed by the Board, but she asks that we overturn the Board's Final Order and "return her advanced practice nursing license to its unencumbered state." Initially, we note that the Board is empowered to revoke any certificate or license to practice nursing or otherwise discipline a licensee if evidence shows that the licensee is guilty of a crime; is unfit or incompetent due to negligence, habits, or other reason; or has engaged in unprofessional conduct. Tenn. Code Ann. § 63-7-115(a)(1); TENN. COMP. R. & REGS. 1000-01-.04(4). The rules and regulations describe the penalties the Board is authorized to impose upon a licensee it finds guilty of violating the Nursing Practice Act or the rules and regulations. *See* TENN. COMP. R. & REGS. 1000-01-.04(6)(a)-(b). Consistent with this portion of the rules and regulations, the Board explained that it was imposing sanctions on Ms. Hollahan because it "has been charged with protecting the health and welfare of the citizens of the State of Tennessee," and it was the Board's policy "to take disciplinary actions so as to ensure the health and safety of the citizens of this state." The Board was authorized by Tenn. Code Ann. § 63-7-115(d) to assess the costs of the hearing against Ms. Hollahan.

When a court reviews the remedy imposed by an agency, the court limits its review to determining whether the remedy is "unwarranted in law" or "without justification in fact." *Robertson v. Tenn. Bd. of Soc. Worker Certification & Licensure*, 227 S.W.3d 7, 14 (Tenn. 2007) (citing *Mosley v. Tenn. Dep't of Commerce & Ins.*, 167 S.W.3d 308, 321 (Tenn. Ct. App. 2004)); *see also Butz v. Glover Livestock Comm'n Co.*, 411 U.S. 182, 185-86 (1973) (holding that administrative agency's choice of sanction should not be overturned if it is warranted in law and justified by facts). As this court explained in *Mosley v. Tennessee Department of Commerce and Insurance*,

> Neither the chancery court nor the Court of Appeals is empowered to substitute judicial judgment in the place of the judgment of an administrative tribunal acting within the scope of its statutory authority. Neither the chancellor nor this Court may soften the sanctions imposed by the administrative tribunal [if] the sanctions imposed by the administrative tribunal are clearly warranted in law and justified in fact. At this point, the judicial inquiry comes to an end.

*Mosley*, 167 S.W.3d at 323.

Having confirmed that the Ms. Hollahan violated the statutes and regulations at issue, our sole task is "to examine the sanction imposed in light of the administrative

record in order to judge whether the agency properly applied the regulations, *i.e.*, whether the sanction is 'unwarranted in law' or 'without justification in fact.'" *Id.* at 321 (quoting *Woodard v. United States*, 725 F.2d 1072, 1077 (6th Cir. 1984)).  As discussed above, the Board's decision to revoke Ms. Hollahan's certificate to practice as an advanced practice nurse and license to practice as a registered nurse in Tennessee and the multistate privilege to practice in any other party statute, as well as the civil penalties imposed against her, were all warranted by the law and justified by the facts.  As a result, we affirm the Board's decision in its entirety.

III.  CONCLUSION

The judgment of the trial court is affirmed, as modified.[10]  The costs of this appeal shall be taxed against the appellant, Catherine J. Hollahan, for which execution shall issue if necessary.

_____
ANDY D. BENNETT, JUDGE

---

[10]See footnote 8.